CASE NO. 14-4130

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

HUSTLER CINCINNATI, INC., ET AL.,

Plaintiffs-Appellants,

v.

PAUL CAMBRIA JR., ET AL.,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Case Number: 1:11-CV-00718

---

PLAINTIFFS-APPELLANTS' PRINCIPAL MERIT BRIEF
(ORAL ARGUMENT REQUESTED)

---

Submitted By:

s/ Robert W. Hojnoski
Robert W. Hojnoski (0070062)
Carrie M. Starts (0083922)
REMINGER CO., L.P.A.
525 Vine Street, Suite 1700
Cincinnati, Ohio 45202
Tel: 513/721-1311; Fax: 513-721-2553
E-mail: rhojnoski@reminger.com; cstarts@reminger.com
*Attorneys for Plaintiffs/Appellants*

**US COURT OF APPEALS FOR THE SIXTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST**

Pursuant to 6th Cir. R. 26.1, Appellants make the following disclosures:

**1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:**

No.

**2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:**

No.

s/ Robert W. Hojnoski, Esq.                              3/27/15
Robert W. Hojnoski, Esq.                                 Date
Attorney for Defendants-Appellees

# **TABLE OF CONTENTS**

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS ................................................. ii

TABLE OF CONTENTS ....................................................................... iii

TABLE OF AUTHORITIES ..................................................................... vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................................... x

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 2

STATEMENT OF THE CASE ................................................................ 3

    A.    Nature of the Case ................................................................. 3

    B.    Procedural Posture and Disposition Below ........................................... 4

STATEMENT OF FACTS ..................................................................... 5

    I.    Defendants' Representation of Jimmy Flynt in the 1970s ................... 5

    II.    Defendants' Representation of Jimmy Flynt Following
        the Hustler Retail Division Formation in 1996-2008 .......................... 6

    III.    Defendants' Continued Representation of Plaintiffs Throughout
        the Expansion of Hustler Retail Stores (2002-2008) .......................... 18

    IV.    Defendants' Concurrent Representation of both Jimmy and
        Larry Flynt's Interests During the Transfer of 411 Elm
        Street Property, Transfer of HH Monroe Stock, and Initiation
        of Payment of Licensing Fees by HCI (2004-2006) .......................... 21

        A.    Transfer of the 411 Elm Street Store
            From Jimmy/HCI to Larry Flynt ............................................. 22

B.   The Uncompensated Transfer of Jimmy
100% Interest in Hustler Hollywood Ohio
(HH Monroe) Stock to Larry Flynt.............................................23

C.   HCI Begins Paying Monthly Licensing Fees to
LFP in 2004-2005 at the Advice of Cambria...........................26

V.   Email Communications between
Cambria and Jimmy (2004-2006) .......................................................27

VI.   Defendants' Drafting of Proposed Pension Plan and
Advice to Jimmy Regarding Human Resources Matters...................28

VII.   2009 - Squeeze Out / Adverse Action
Taken by Defendants Against Plaintiffs .............................................29

SUMMARY OF THE ARGUMENT ..................................................................31

ARGUMENT ......................................................................................................34

A.   Standard of Review ..........................................................................34

B.   The District Court erred in Granting Summary Judgment
Regarding Jimmy's Legal Malpractice Claims...................................34

1.   Plaintiffs Demonstrated a Genuine Issue of Material Fact
Regarding a Direct Claim of Legal Malpractice.....................34

2.   Plaintiffs Raised a Genuine Issue of Material
Fact Regarding Indirect Claims for Legal Malpractice ...........47

i.   Plaintiffs were in privity with defendants ....................47

ii.   The malice exception....................................................50

C.   Reasonable Minds Could Conclude that Defendants
Tortiously Interfered With Plaintiffs' Contractual
Relations, Business Relations & Expectancy Interests.....................52

iv

D.    Reasonable Minds Could Conclude that Defendants
Interfered with Jimmy's Expectancy/Retirement Interests .................59

CONCLUSION .......................................................................................60

CERTIFICIATE OF COMPLIANCE ....................................................61

CERTIFICATE OF SERVICE ...............................................................61

DESIGNATION OF RELEVANT
LOWER COURT DOCUMENTS ..........................................................62

# TABLE OF AUTHORITIES

**Page**

*A&B-Abell Elevator Co. v. Columbus/Cent. Ohio
Bldg. & Constr. Trades Council*,
73 Ohio St.3d 1, 651 N.E.2d 1283 (1995) ..............................................54

*ABS Industries, Inc. ex rel. ABS Litigation Trust v. Fifth Third Bank*,
333 Fed.App'x. 994 (6th Cir. 2009) ........................................................49

*Breinholt v. Aegis Wholesale Corp.*,
No. 10-CV-00466-EJL, 2012 WL 2865969 (D.Idaho July 11, 2012)....................49

*Carnegie Cos., Inc. v. Summit Properties, Inc.*,
183 Ohio App.3d 770, 918 N.E.2d 1052, 2009-Ohio-4655 (2009)........................35

*CenTra, Inc. v. Estrin*, 538 F.3d 402 (6th Cir. 2008) ..............................................45

*Chandler & Assocs. v. America's Healthcare Alliance*,
125 Ohio App.3d 572, 709 N.E.2d 190 (1997) ......................................................52

*Contemporary Villages, Inc. v. Hedge*,
No.: 2:05-cv-170, 2005 U.S. Dist. LEXIS 9873
(S.D. Ohio May 24, 2005) ......................................................................57

*Cooper v. Jones*,
No. 05CA7, 2006 WL 895210 (Ohio Ct. App. Mar. 29, 2006)..............................54

*Crawford v. Roane*,
53 F.3d 750 (6th Cir. 1995) ......................................................................1

*Cuyahoga Cty. Bar Assn. v. Hardiman*,
100 Ohio St.3d 260, 798 N.E.2d 369, 2003-Ohio-5596 (2003) ..............................35

*Davis v. Sun Ref. & Mktg. Co.*,
109 Ohio App.3d 42, 671 N.E.2d 1049 (1996) ......................................................55

*Diamond Wine & Spirits v. Dayton Heidelberg Distrib. Co.*,
148 Ohio App.3d 596, 774 N.E.2d 775 (2002) ......................................................53

*Dimov v. EMC Mortg. Corp.*,
No. 1:11-CV-160, 2012 WL 1071186 (E.D. Tenn. Mar. 29, 2012) ........................49

*Doyle v. Fairfield Mach. Co.*,
120 Ohio App.3d 192, 697 N.E.2d 667 (1997) ......................................................55

*Extracorporeal Alliance, L.L.C. v. Rosteck*,
285 F. Supp. 2d 1028 (N.D. Ohio 2003) .................................................................52

*Firestone v. Galbreath*,
67 Ohio St.3d 87, 616 N.E.2d 202 (1993) ..............................................................59

*Fred Siegel Co. v. Arter & Hadden*,
85 Ohio St.3d 1717, 707 N.E.2d 853 (1999) ...............................................53, 54, 56

*Gray-Jones v. Jones*,
137 Ohio App.3d 93, 738 N.E.2d 64 (2000) ...........................................................54

*Hahn v. Satullo*,
156 Ohio App.3d 412, 806 N.E.2d 567, 2004-Ohio-1057 (2004) ..........................50

*Henry Filters, Inc. v. Peahody Barnes, Inc.*,
82 Ohio App.3d 255, 611 N.E.2d 873 (1992) .........................................................35

*Hicks v. Bryan Med. Group, Inc.*,
287 F. Supp. 2d 795 (N.D. Ohio 2003) ...................................................................56

*Hoover v. Curtis*,
No. 18580, 2001 Ohio App. LEXIS 2653
(Ohio Ct. App. June 15, 2001) ................................................................................55

*Jaro Transp. Servs. v. Grandy*,
No. 4:03-CV-01227, 2006 U.S. Dist. LEXIS 62932
(N.D. Ohio Sept. 5, 2006) .......................................................................................55

*Kenty v. Transamerica Premium Ins. Co.*,
572 Ohio St.3d 415, 650 N.E.2d 863 (1995) ..........................................................53

*Klapchar v. Dunbarton Props. Ltd.*,
No. CA-8521, 1991 WL 249432 (Ohio Ct. App. Nov. 4, 1991) .............................55

*Lapping v. HM Health Servs.*,
No. 2000-T-0061, 2001 WL 1602683 (Ohio Ct. App. Dec. 14, 2001) ...................53

*LeRoy v. Allen, Yurasek & Merklin*,
114 Ohio St.3d 323, 872 N.E.2d 254 (2007) ......................................................47, 50

*Lillback v. Metro Life Ins. Co., LPA*,
94 Ohio App.3d 100, 640 N.E.2d 250 (1994)...........................................................35

*Medical Mut. of Ohio v. K. Amalia Enters., Inc.*,
548 F.3d 383 (6th Cir. 2008) ...................................................................................34

*Moffitt v. Litteral*,
No. 19154, 2002-Ohio-4973,
2002 WL 31105394 (Ohio Ct. App. Sept. 20, 2002).............................................51

*Petrovski v. Fed. Express Corp.*,
240 F. Supp. 2d 685 (N.D. Ohio 2003)...................................................................57

*Reagan v. Ranger Transp., Inc.*,
No. 97-P-0102, 1998 Ohio App. LEXIS 5824
(Ohio Ct. App. Dec. 4, 1998)....................................................................................53

*Ryan v. Wright*,
No. 06AP-962, 2007-Ohio-942, 2007 WL 661815
(Ohio Ct. App. Mar. 6, 2007)...................................................................................50

*Sayyah v. Curtell*,
143 Ohio App.3d 102, 757 N.E.2d 779 (Ohio Ct. App. 2001)................... 34-35, 48

*Scholler v. Scholler*,
10 Ohio St.3d 98, 462 N.E.2d 158 (1984) .........................................................47, 48

*Simon v. Zipperstein*,
32 Ohio St.3d 74, 512 N.E.2d 636 (1987) .........................................................48, 50

*Shoemaker v. Gindlesberger*,
118 Ohio St.3d 226, 887 N.E.2d 1167, 2008-Ohio-2012 (2008) ......................48, 50

*Smith v. Ameritech*,
129 F.3d 857 (6th Cir. 1997) .................................................................34

*State v. Bergsmark*,
No. L-03-1137, 2004-Ohio-5753, 2004 WL 2426236
(Ohio Ct. App. Oct. 29, 2004) .............................................................55

*Super Sulky Inc. v. U.S. Trotting A'ssn.*,
174 F.3d 733 (6th Cir. 1999) ...............................................................56

*Vahilla v. Hall*,
77 Ohio St.3d 421, 674 N.E.2d 1164 (1997) .........................................34

*Wauseon Plaza, Ltd. P'ship v. Wauseon Hardware Co.*,
156 Ohio App.3d 575, 807 N.E.2d 953 (Ohio Ct. App. 2004)...............55

*Wilkey v. Hull*,
598 F. Supp. 2d 823 (S.D. Ohio 2009) ................................................50

**Statutes**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

**Rules**

Fed. R. Civ. P. 56...................................................................................34

**Other Authorities**

Black's Law Dictionary (8th Ed. 2004)..................................................48

RESTATEMENT (SECOND) OF TORTS § 766 (1979) .................................. 53-54

RESTATEMENT (SECOND) OF TORTS § 767 (1979) .......................................56

RESTATEMENT (SECOND) OF TORTS § 774(B) (1979).....................57, 59, 60

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This consolidated case has a lengthy procedural and factual history and presents complex issues.  The underlying record is expansive, and is evidentially intertwined with a prior related case, *L.F.P.IP., Inc. v. Hustler Cincinnati, Inc.*, Southern District of Ohio No. 1:09-cv-00913, *affd.* 533 Fed.Appx. 615 (6th Cir. 2013). As a result of the large amount of shared evidence, the district court in this matter incorporated by reference all the evidence from *L.F.P.IP., Inc. v. Hustler Cincinnati, Inc.* for consideration in the instant case.  (*See* Order on Motion to Dismiss, RE26, at 2, PID579)  Therefore, Plaintiffs-Appellants respectfully request oral argument and believe that such arguments will be helpful to the Court in deciding the issues raised in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the underlying action based on diversity of citizenship, 28 U.S.C. § 1332. The district court entered a Final Judgment on October 14, 2014 (RE 107). A timely notice of appeal was filed on November 12, 2014. (RE 109) This court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the district court's Final Judgment and all prior adverse non-final rulings and orders. *Crawford v. Roane*, 53 F.3d 750, 752 (6th Cir. 1995).

## **STATEMENT OF ISSUES FOR REVIEW**

Appellants present the following issues for review:

Whether the district court erred in issuing summary judgment to the Defendants-Appellees on Plaintiffs' claims for:

1.    First and Third-Party Legal Malpractice;

2.    Tortious Interference with Contractual and/or Business Relationships; and

3.    Tortious Interference with an Expectancy/Inheritance.

## STATEMENT OF THE CASE

### A. Nature of the Case

In a prior related action, *L.F.P.IP., Inc., et al. v. Hustler* Cincinnati*, Inc.*, et al., Southern District of Ohio No. 1:09-cv-00913, *affd.* 533 Fed.Appx. 615 (6th Cir. 2013) (hereinafter "Flynt I"), which involved a business dispute between biological brothers, Larry Flynt and Jimmy Flynt, this Court affirmed the district court's judgment that Jimmy Flynt did not have a legal or equitable interest in Larry Flynt's media enterprise, Hustler, which operates as a corporate entity, LFP, Inc.

The instant matter is an appeal of summary judgment in a related diversity action for legal malpractice against Jimmy Flynt's former long-time attorneys, Paul Cambria and other attorneys from the Lipsitz-Green firm located in Buffalo, NY. As set forth herein, among other things, Defendants represented Plaintiffs, Jimmy Flynt and HCI, and their corporate predecessors in interest at the same time that Defendants represented Larry Flynt, LFP, Inc. and its related/affiliated corporate affiliates. Despite this concurrent representation, Defendants never disclosed their conflicts of interest to Plaintiffs even though Defendants represented both sides in a series of commercial transactions which were highly unfavorable to Jimmy's interests. As a result of Defendants' legal malpractice and breach of duties,

Plaintiffs have been left financially destitute and have incurred substantial damages.

### B.  Procedural Posture and Disposition Below

This case was originally filed on October 12, 2011. (Complaint, RE1) Defendants filed a motion to dismiss (RE16), which was stayed pending the outcome of the related case of *L.F.P.IP., Inc. v. Hustler* Cincinnati*, Inc.*, Southern District of Ohio No. 1:09-cv-00913.  (See Order on Motion to Dismiss, RE26) Plaintiffs filed an Amended Complaint on February 24, 2012.  (RE17)  After extensive fact and expert discovery, Defendants moved for summary judgment. (RE85)  After the motion was fully brief and submitted, on October 14, 2014, the district court issued a Memorandum Opinion and Order granting summary judgment in Defendants-Appellees' favor on all claims, along with a corresponding final judgment.  (RE106, RE107)  Appellants filed a timely notice of appeal on November 12, 2014.  (RE109)

### STATEMENT OF FACTS

**I.    Defendants' Representation of Jimmy Flynt in the 1970s**

In July of 1976, Larry and Jimmy Flynt were indicted in Hamilton County, Ohio, and charged with pandering obscenity and organized crime (hereinafter "State v. Flynt I").  (Cambria Dep., RE76, at 45, PID1238)  These charges stemmed from the alleged publication and distribution of eleven issues of Hustler magazine in 1975-1976 in Hamilton County. (*See id.*)  Jimmy and Larry were co-publishers of Hustler magazine during this period of time.

Larry and Jimmy hired Buffalo, New York attorneys, Defendant Paul Cambria and Herald Price Fahringer to defend them.  (*See id.*)  Both Cambria and Fahringer were admitted to practice in New York, not Ohio.  They each applied for and ultimately obtained *pro hac vice* admission in Hamilton County.  Cambria became Jimmy's attorney and Fahringer became Larry's attorney, although they worked closely together.   (*See id.* at 47, PID1239)  Cambria and Fahringer's former firm is currently known as Defendant, Lipsitz Green Scime Cambria LLP ("Lipsitz Green").  Cambria was a young associate and Fahringer was a partner at the time.  (*Id.* at 42-43, PID1238)

State v. Flynt I was tried to a Hamilton County jury in February, 1977.  After a high-profile trial, Larry and Hustler magazine were convicted and Jimmy was acquitted.  (*See id.* at 51-52, PID1240)  Cambria represented Jimmy through

the verdict. (*See id.* at 51, PID1240) After the verdict, Cambria and Fahringer represented Larry (and Hustler Magazine) in connection with post-verdict motions and on appeal. (*See id.*at 52, PID1240) Cambria's representation of Jimmy in State v. Flynt I was under Lipsitz Green client ID number **11740** – matter number 000001.[1]

## II.    Defendants' Representation of Jimmy Flynt Following the Hustler Retail Division Formation in 1996-2008

In December, 1996, Columbia Pictures released the movie entitled "The People vs. Larry Flynt." As of this time: (1) the Hustler Enterprise consisted of approximately 10 inter-related and affiliated corporate entities; (2) HUSTLER did not have a retail division; (3) most of HUSTLER's legal services were being provided by a California attorney, Alan Isaacman and his law firm, Isaacman, Kaufman & Painter, based in Los Angeles; (4) Jimmy and Larry were paid, and received benefits, through L.F.P., Inc., the putative "parent/umbrella" company within HUSTLER. There were several movie premiers held for People v. Flynt,

---

[1]And as referenced repeatedly herein, Lipsitz Green client ID# 11740 has been consistently used by Defendants on essentially every document in any way connected to Larry or Jimmy Flynt over the years, regardless of whether the services were provided to them individually or together. (*See e.g.*, Footer of Motion to Disqualify filed in 1:09-mc-43, RE81-2, PID3170; Footer of Retail Lease Between Lakeview Properties and Hustler Hollywood, Ohio, RE81-6, PID3238, Footer of License Agreement Between LPF, Inc. and Hustler Hollywood, Ohio, RE81-7, PID3257, Footer of License Agreement between LFP, Inc. and HCI, RE81-9, PID3277, Footer of Retail Lease Between Elm411 and HCI, RE81-7, PID3286)

including a premier in Cincinnati on January 7, 1997. (*See id.* at 38-39, PID1237) Larry and Jimmy personally attended the premier as did Defendant Cambria. (*See id.*)

While visiting Cincinnati for the movie premier, Jimmy and Larry discussed the idea of opening a Hustler bookstore in downtown Cincinnati. (J. Flynt Declaration, ¶ 5, Flynt I, RE179, PID8617)[2] Jimmy found a location at 34 E. Sixth St. (*Id.* at ¶ 6, PID8617) After a lease was obtained, a small staff was hired and the store was stocked with merchandise, including Hustler magazines. It took limited funds to open the store, which was an instant success and drew a lot of attention from the local media and law enforcement. Hustler Books, Magazines and Gifts opened on October 22, 1997. (*Id.* at ¶ 2, Flynt I, RE179, PID8616) Allie Jackson III was retained as the bookkeeper/accountant. (*Id.* at ¶ 6, PID8617) An Ohio corporation, Hustler News & Gifts, Inc. (HNG), was set up and incorporated on October 21, 1997 to operate this store. Jimmy Flynt was the sole shareholder, officer and director of HNG. (*Id.* at ¶ 2, PID8616) HNG did not enter into any "licensing" contracts or otherwise pay any monies for use of the HUSTLER name. This was the first time HUSTLER was used in retail. (*See id.* at ¶ 8, PID8617)

---

[2] The relevant docket entries from Flynt I, Southern Dist. Case No. 1:09-cv-00913, are indicated separately in the designation of relevant evidence. The district court in this matter incorporated by reference all the evidence from Flynt I for consideration in the instant case. (*See* Order on Motion to Dismiss, RE26, at 2, PID579)

Less than six months after HNG opened, Larry and Jimmy were indicted in April, 1998, and charged with various criminal counts of obscenity by the State of Ohio in the Hamilton County Court of Common Pleas under Case Number B9802210 – State v. Flynt II. (*See id.* at ¶ 9, PID8617)  These charges stemmed from the alleged sale of adult-themed videos to a minor at the HNG store.  (J. Flynt Dep., RE78, at 10-11, PID1511-1512)  Jimmy and Larry retained a team of lawyers, including Defendant Paul Cambria and his law firm, Defendant Lipsitz Green in Buffalo, NY and Alan Isaacman from Los Angeles. (Cambria Dep., RE76 at 60-65, PID1242-1243) Lou Sirkin was retained as local counsel.  (*See id.*)  Mr. Cambria applied for *pro hac vice* admission on Jimmy's behalf just as he had previously done in 1976-77 when he represented Jimmy in connection with State v. Flynt I.   An ancillary civil action was also pursued against the Hamilton County prosecutor by Cambria and Lou Sirkin as co-counsel on behalf of Jimmy and Larry.  (*See Flynt v. Deters*, Hamilton County Court of Common Pleas, Case No. A9803819)

Thereafter, while the State v. Flynt II charges were pending, a second "Hustler Hollywood" retail store opened in West Hollywood, California in December of 1998.  State v. Flynt II commenced trial on May 10, 1999 after extensive investigation, discovery and motion practice.  On May 12, 1999, while jury selection was still ongoing, a plea agreement was reached whereby it was

agreed that Hustler News and Gifts would be substituted as a Defendant as to several of the counts, that the corporate entity would plead guilty to two counts of pandering obscenity and pay a $10,000 fine, and that all of the remaining charges would be dismissed against Larry and Jimmy. (J. Flynt Declaration, ¶ 9, Flynt I, RE179, PID8617) Jimmy and Larry's attorneys/defense team as well as outside legal expenses were paid by Jimmy through Hustler News & Gifts, Inc. (*See id.* at PID8617-8618; *see also* J. Flynt Dep., RE78, PID1521) In all, over $400,000 were paid out in legal fees and expenses for Jimmy and Larry's defense. (*See* J. Flynt Declaration, RE179, at PID 8618) A significant portion of these fees were incurred by Defendant Cambria and Defendant Lipsitz Green. (*See id.*) Defendant Reina, then a law clerk, and other attorneys and staff at Lipsitz Green worked on State v. Flynt II and provided services on Jimmy's behalf. Similar to Cambria/LG's representation of Jimmy in State v. Flynt I in the 1970's, Cambria/LG's representation of Jimmy in State v. Flynt II was opened, handled and billed under LG Client Number **11740**; matter number 11740.00002. (*See* Reina Dep. and Exhibits, RE84, *see also* RE84-2, PID3611-3646)

Shortly after the plea agreement was reached in State v Flynt II, the City of Cincinnati evicted HNG from 34 E. 6th St. through eminent domain proceedings as part of the City's plan to build a contemporary arts center at the corner of Sixth and Walnut streets. (J. Flynt Declaration, ¶ 10, Flynt I, RE179, PID8618) Jimmy then

9

sought out a new location to re-open a Hustler retail store in Cincinnati. (*See id.* at ¶ 13, PID8618) A store was temporarily opened in early November, 1999 at 609-611 Race Street but after a dispute with the building owner, Jimmy/Hustler News & Gifts moved out and sought a new location. (*See id.*)

Around this time, in late 1999, Jimmy and Larry discussed the opening of a third Hustler retail store. Jimmy found a site off of I-75 in Monroe, Ohio, at 1038 Lebanon St. Thereafter, Jimmy acquired this real estate for $250,000. (J. Flynt Dep., RE78 at 165-166, PID1666-1667)

After acquiring the Monroe, Ohio property, Jimmy found an available building at 411 Elm Street to re-open the downtown Cincinnati HUSTLER store – "Hustler Cincinnati." (J. Flynt Declaration, ¶ 15, Flynt I, RE179, PID8619) He entered into a lease agreement ($3,000/year) with an option to buy and the doors of "Hustler Cincinnati" opened in early April, 2000. (*See id.* at ¶ 15-16) A new Ohio corporation was formed/incorporated to operate this store – Plaintiff Hustler Cincinnati, Inc. ("HCI"). (*See id.*, ¶¶ 3-4, Flynt I, RE179, PID8616) Although Larry has testified on multiple occasions that he viewed himself as the owner of HCI, Jimmy has been judicially determined to be HCI's sole owner by the Southern District of Ohio in Flynt I.

Between May – November, 2000, a 7,200 square foot commercial building was built to serve as the new Hustler Hollywood store in Monroe. (*See id.* at ¶ 37,

10

PID8621)  On or about October 12, 2000, as construction was ongoing for the new Monroe Hustler store, Jimmy transferred the deed to the Monroe property to Lakeville Properties, Inc., a newly formed Ohio Corporation formed in 1999, owned on paper by Larry.  Attorney Lou Sirkin filed this paperwork.  Allie Jackson, III was retained as the bookkeeper/accountant.  (*See id.* at ¶ 6, PID8617)

Hustler Hollywood of Ohio, Inc. (n/k/a HH-Monroe, Inc. hereinafter "HH Monroe"), an Ohio corporation, was set up and incorporated on November 14, 2000 to serve as the operating entity of the Monroe Hustler Hollywood store.  Mr. Sirkin filed this paperwork with Jimmy appointed as President and sole director. Jimmy was the 100% owner of the shares that were initially issued.  (*See id.* at ¶ 3, PID8616)  According to Larry, pursuant to an oral agreement he had with Jimmy, the shares were put into Jimmy's name to protect Larry from criminal prosecution and to protect his California gaming license.  (*See, e.g.*, L. Flynt Dep., RE79, at 120, PID2249) According to Jimmy and his accountant, Jimmy was the true owner of this stock.  (J. Flynt Declaration, ¶¶ 3, 37, Flynt I, RE179, PID8616, 8621; J. Flynt Dep., RE78, at 39, PID1540; Allie Jackson Dep., RE89, at 23, PID3972) The district court, in Flynt I, similarly held that Jimmy was the owner of the Hustler Hollywood store in Monroe, Ohio when the store first opened.  (*See* Opinion and Order re:  Trademark Issues, *Flynt I*, RE187, PID8772 ("Jimmy formed "Hustler Hollywood Ohio, Inc. . . . This corporation was formed to operate the "Hustler

Hollywood store that opened in Monroe, Ohio in December 2001.  Jimmy Claims that he is the owner and president of HH Ohio.").  The Hustler Hollywood store in Monroe held its grand opening on December 16, 2000.

Just before the Monroe store opened, a 10 year retail lease agreement was put together between Lakeville Properties (*i.e.,* Larry) as the landlord and Hustler Hollywood of Ohio, Inc. (i.e., Jimmy) as the tenant. (See Plaintiffs' Dep. Exhibit 15 to Gumkowski Dep., RE81-5, PID3198)  This lease was drafted by the Isaacman Painter law firm in California who handled a lot of Hustler/LFP's corporate work.  Larry signed the lease as President of Lakeville and Jimmy signed the lease as President of Hustler Hollywood of Ohio.  (*See id.* at PID3213)  The monthly rental amount started at $14,700 and escalated to $17,500 in year 10. (*See, generally*, *id.*)  The Monroe store was an instant and overwhelming commercial success and exceeded all sales expectations.  (*See* J. Flynt Dep., RE78, at 77, PID1578)

Shortly after the Monroe store opened, Jimmy/Hustler Cincinnati exercised the option to purchase the 411 Elm Street property in Cincinnati for $250,000. (*See id.* at 108-109, PID1609-1610)  Financing was obtained through a loan from LFP and a private mortgage through M&T Bank.  (*See id.* at 126-127, PID1627-1628)  A closing was held and HCI acquired the deed.  (*See id.*)

Up and through this time and in the months after State v. Flynt II ended, Defendant Cambria kept in regular communication with Jimmy. (*See id.* at 147-148, PID1648-1649) Cambria consistently pressed Jimmy for the opportunity to take on a larger role and to provide a broader range of legal services to Jimmy, Larry and the LFP family of entities. (*See id.* at 30, PID1531)

In or around late 2000/early 2001, after Larry had a falling out with Alan Isaacman in California, Jimmy recommended to Larry that Cambria and his firm become their outside general counsel responsible for handling their various legal needs across the country, to specifically include the blossoming retail group. (*Id.* at 28-44, PID1529-1545) After a series of phone conversations and at least one meeting at the Four Seasons Hotel in California, Cambria/Lipsitz Green were orally hired/retained. (*Id.*) A fixed yearly retainer amount was set. (*Id.* at 34-35, PID1535-1536) Jimmy was actively involved with discussions with Cambria and Larry regarding this retainer agreement to include its scope. (*Id.*) Jimmy was specifically informed that the agreement would include him and his business interests, and testified unequivocally at his deposition that Cambria and his firm would represent him personally, as well as HCI, Larry, and LFP:

> Q.   I take it you don't dispute that Paul [Cambria] is general counsel to Larry and the LFP?
> A.   He's also counsel for me and Larry.
> Q.   You agree that he is general counsel to Larry and LFP; correct?
> A.   And also me.

13

Q.  I'm not going to stop you from answering that you think that, but at least you think he does represent Larry?

A.  He represents counsel, he represents the corporation, he represents Larry, he represents me.

*See id.* at 147, PID 1648)  Allie Jackson, Jimmy's accountant and the accountant for several local LFP entities, was also advised that the retainer agreement specifically included Jimmy and the entities that he owned at that time – HCI and HH Monroe.  (Allie Jackson Dep., RE89, at 97, PID4046 (testifying that it was his understanding that Lipsitz Green was one of the firms doing work for HCI))  It is undisputed that Cambria did not advise Jimmy that he or his firm would have a conflict of interest in taking on this broader representation or that he/his firm would only be looking out for Larry's best interests going forward.  (*See* Cambria Dep., RE76, at 147-148, PID1264-1265)  At no time did Cambria advise Jimmy that in the event Jimmy and Larry had a divergence of interests, falling out, dispute, disagreement, etc., that he would take Larry's side and would take action adverse to Jimmy and against his interests.  (*See id.*)

Cambria subsequently put together a team of lawyers in his firm, including Defendants Gumkowski, Deal, Reina, and others, to handle the Flynt/Hustler account, to be billed under Lipstiz Green client ID number: **11740**, the same client number utilized by LG in connection with State v. Flynt I and State v. Flynt II. Cambria quickly entrenched himself within HUSTLER and considered himself "part of the family."    (See 08/24/04 email correspondence contained within

14

Plaintiffs' Deposition Exhibit 1 to Defendants' depositions, Docs. 76, 81, RE76-1, PID1302)

At the time Cambria and Defendant Lipsitz Green were retained as outside counsel in early 2001, there were 3 Hustler retail stores in operation: (1) Hustler Cincinnati (formerly Hustler News & Gifts) at 411 Elm Street; (2) Hustler Hollywood on Sunset Blvd. in Beverly Hills, CA; and (3) Hustler Hollywood in Monroe, Ohio. Jimmy was the majority owner within the Hustler retail division by virtue of his 100% ownership of 2 out of 3 stores. (J. Flynt Dep., RE78 at 38-39, PID1539-1540) In addition, at the time that Cambria and Lipsitz Green were put on retainer, Jimmy was a director of L.F.P., Inc. (the putative parent company of HUSTLER) and President of Hustler Entertainment, Inc. (the on-paper operating entity of the Sunset Blvd. store). (*See* RE81-3, PID3179-3180) Jimmy was paid his salary and benefits through the Hustler Monroe store, which he owned. (Jackson Dep., RE89 at 42, PID3999) Also, as of 2001 and through 2007, Jimmy had a significant percentage interest in the Larry Flynt Trust, valued in excess of $600,000,000, pursuant to Larry's promises and contractual representations to Jimmy regarding same. (Larry Deposition, RE79, at 89, PID2242; *see also* Jackson Dep. RE89, at 99, PID4048 (testifying that the trust was worth between $600-700,000,00)) All of this was known to Cambria and to Lipsitz Green. Cambria and LG quickly learned about the Larry Flynt Trust and knew that it was set up to

15

hold/control the majority of HUSTLER's assets and operations. (*See* J. Flynt Dep., at 146, PID1647)  Cambria and Defendant Attorneys also knew that Jimmy and Larry had a close, confidential, business relationship.

Cambria and his team of HUSTLER attorneys and staff took possession of Alan Isaacman's legal files and the majority of HUSTLER's legal documents and files.  As of this time, the Hustler Enterprise consisted of a relatively small number of entities, approximately 10-12, including Hustler Cincinnati, Inc. and Hustler Hollywood of Ohio, Inc.

One of the first things that Cambria and Lipsitz Green did around the time they were retained as outside general counsel was to put in place two new legal contracts (a replacement 10 year "lease" agreement and a new "licensing" agreement)  in connection with the Hustler Hollywood store in Monroe, Ohio which was owned 100% by Jimmy. (*See* Attachments to Gumkowski Dep., RE81, PID1227)    The primary purpose for these contracts was to get the significant profits out of the Monroe store back to the company headquarters in California and to also provide "criminal protection" to Larry who had recently acquired a gaming license in California.  (A. Jackson Dep., RE89, at 40, PID3989; L. Flynt dep., RE79, at 22, 52, PID2227, 2234)

The new lease was designed to replace the initial lease (which was less than 6 months old into a 10 year term) and to significantly raise the monthly rent from

$14,700 a month to $27,000 a month for the first year.  As to the new "licensing" agreement, its terms required the Monroe store to begin paying $65,000 a month (to L.F.P., Inc.) for use of the Hustler name/trademarks.

The revised "lease" agreement and the new "licensing" agreement that were put in place for Hustler Hollywood of Ohio, Inc. were drafted by Defendant Gumkowski who sent them directly to Jimmy for execution on or about June 1, 2001. (*See* RE76-1, PID1297)    No other attorneys were involved.  (*See id.*, although Paul Cambria was copied on correspondence regarding the agreement. (*See id.*)  Jimmy specifically recalls speaking to Cambria regarding the license agreement.  (J. Flynt Dep., RE78, at 118-119, PID1619-1620) At no time was Jimmy asked to sign a conflict waiver with regard to these contracts.  (*See* Cambria Dep., RE76, at 147-148, PID1264-1265; Gumkoski Dep., RE81 at 34-35, 43 PID3089, 3100) At no time did Defendant Gumkowski or Defendant Cambria inform Jimmy that these agreements were not in his overall best interests, that they were one sided in Larry's favor, that they were being used to dilute or diminish Jimmy's role, interest or rights in the years to come.  (*See, generally*, RE76, 81) As of this point in time, Jimmy had no experience whatsoever with regard to licensing contracts.  Jimmy was directed by his legal counsel, Cambria and Gumkowski, to execute the agreements, and he did so.  Jimmy was never advised to obtain independent legal advice, did not obtain independent legal advice and

was never told that his interests were being put below Larry's or that he was otherwise being set up to be squeezed out of the company at some point in the future.

Attorney Gumkowski billed for his time related to the preparation of the new lease and licensing agreements and that bill was ultimately sent to Jimmy's accountant, Allie Jackson, III for payment. (*See* RE76-1, PID1299)  Billing was under Client No. 11740.  Attorney Gumkowski sent the new lease and licensing agreements directly to Jimmy for his signature.  (Gumkowski Dep., RE81-1, PID3128) (June 6, 2001 Correspondence from Gumkowski to Jimmy)

Through the revised "lease" agreement and "licensing" agreement, monies generated from the Monroe store were poured back into the Hustler Enterprise. These monies were used toward Defendants' legal fees/retainer and were also used to expand the entire Hustler Enterprise, to include the blossoming retail group. (Allie Dep., RE 89, at 54, PID 4003; L. Flynt Dep., RE 79, at 20, PID2226)

### III.    Defendants' Continued Representation of Plaintiffs Throughout the Expansion of Hustler Retail Stores (2002-2008)

After the Hustler Hollywood store opened in Monroe, OH, in addition to overseeing operations at the Cincinnati and Monroe locations, and to a lesser extent, the Sunset store, Jimmy focused his business activities on further growing and expanding the retail arm of the company.  Growth was fueled by the significant profits generated from the Monroe store. (J. Flynt Dep., RE 78, at 77,

18

PID1578) The initial plan/vision was to open five new Hustler retail stores a year throughout the country.  (*See id.*)  Jimmy traveled all over the United States scouting locations for new stores, obtained the necessary building, zoning and operating permits and licenses, coordinated design and construction, recruited, hired and trained staff, got the stores stocked and set-up to conduct business and otherwise managed the store openings and initial operations.  (*See id.*)  Jimmy worked very closely with Cambria and Defendant attorneys, relying on their legal advice, guidance and judgment, with respect to zoning issues, real estate issues, employment issues, criminal issues, contractual issues and all other legal matters. During this time period, Jimmy was never told that his employment status was at will, or that he was simply a straw man with no real ownership interests.  (Cambria Depo., RE76 at 237, PID1286)  Cambria and Defendant attorneys retained local counsel throughout the country to assist with the retail expansion.  (J. Flynt Dep., RE78, at 160-170, PID1661-1671) (L. Flynt Dep., RE79, at 106, PID2246)  Lou Sirkin and Howard Schwartz continued to serve as local counsel for Jimmy and Larry and LFP in Ohio and Kentucky.  (*Id*. at 108, PID2246)

Between 2002 and 2008, the Hustler retail division grew rapidly. New stores opened in San Diego (2002), Lexington, KY (July 16, 2004), Fort Lauderdale, Florida (July 23, 2004), New Orleans, LA (November 18, 2004), Nashville, TN (June 17, 2005), Tacoma, WA, (September 8, 2006) and St. Louis, MO (May 7,

2007).    Individual corporations/limited liability companies were set up by Defendant attorneys to own/operate these various stores "on paper." Cambria and Defendant attorneys provided legal advice and guidance to Jimmy in connection with these stores (related to employment issues, tax issues, corporate issues, construction/planning issues, content issues, contractual issues, etc.).    (J. Flynt Dep., RE78, at 80-85, PID1581-1586)    Cambria did make various public statements related to Jimmy's ownership of the Hustler Hollywood store that opened in Lexington, KY in 2005 and which became involved in litigation (*See* RE76-3, PID1408 (identifying Cambria as "the prominent First Amendment attorney who is representing tore owner Jimmy Flynt" in the case).    Jimmy faced personal criminal exposure with respect to each of the stores that opened as he was in charge of retail, and was ultimately in charge of the content of the merchandise that was stocked and sold to the public.  (J. Flynt Dep., RE78, at 80, PID1581)

In 2003, efforts were made by the State of Ohio to reinstitute criminal charges against Larry and Jimmy in Hamilton County.  Cambria/LG worked with Lou Sirkin to prevent further prosecution through the filing of a Writ of Prohibition which was favorably decided by Ohio's First District Court of Appeals in April of 2004. Various court documents were signed and filed by Cambria and Sirkin as counsel for "Realtors" [sic] Jimmy and Larry.  (J. Flynt Dep., RE78, at 134,

20

PID1635; *see also* pleadings and docket from Hamilton County Court of Common Pleas, Case No.: B 9802210-B, RE99-3, PID5442-5457)

**IV.  Defendants' Concurrent Representation of both Jimmy and Larry Flynt's Interests During the Transfer of 411 Elm Street Property, Transfer of HH Monroe Stock, and Initiation of Payment of Licensing Fees by HCI (2004-2006)**

Beginning in 2003 and continuing through March of 2006, Cambria/LG orchestrated the sale/transfer of two significant assets from Jimmy/HCI to Larry and/or an entity owned or controlled by Larry – the 100% stock ownership of the Hustler Hollywood retail store in Monroe, Ohio and the real property located at 411 Elm Street in downtown Cincinnati. Jimmy was advised that it was necessary to transfer these assets in order to assist the company and Larry in applying for a large commercial loan which was going to be used to further grow and expand the enterprise. (Larry Dep., RE79, at 58-59, PID2236)  Mr. Cambria, with Mr. Gumkowski's assistance, orchestrated these transactions.  Mr. Cambria also counseled Jimmy/HCI to begin paying licensing fees, which had not been paid in the past. (J. Flynt Dep., RE78, at 175-77, PID1676-1678) (Cambria Dep., RE76-1, PID1297) Defendants served as counsel for both sides in these transactions. (Larry Flynt Depo taken in *HCI v. Elm 411* on April 16, 2010, at 20-22, RE97, PID5269-5271) (J. Flynt Dep., RE78, at 150-155, PID1651-1656) No conflicts of interest were ever disclosed. (Cambria Dep., RE79, at 147-148, PID1264-1265) Jimmy was never advised that Defendants did not represent his interests; that the

transactions were not in his best interests; that he could refuse to make the requested transfers; that he needed to obtain independent legal advice; or that he was making these asset transfers as an at-will employee. *See id.* Jimmy was also not informed as to the potential negative trademark consequences by beginning to pay licensing fees out of HCI. (*See id.*)

### A. Transfer of the 411 Elm Street Store From Jimmy/HCI to Larry Flynt

In June, 2003, Larry requested Jimmy/HCI to sell or transfer the 411 Elm St. property to him. Defendant Cambria sent out e-mail communications and advice regarding this transaction including advice that HCI begin paying licensing fees to insulate, protect and distance Larry from criminal prosecution in Cincinnati. (*See* Cambria Dep., RE76-1, PID1303) Over the course of the following 1-2 years, attorney Gumkowski worked together with attorneys Lou Sirkin and/or Howard Schwartz, as local counsel, as well as Jimmy and Larry's mutual financial representatives to put together a series of documents, including a Purchase Agreement and one or more lease agreements, in order to sell the 411 Elm St. property from Hustler Cincinnati, Inc. (i.e. Jimmy) to a newly formed Ohio LLC – Elm 411, LLC (i.e., Larry). (J. Flynt Dep., RE78, at 150-155, PID1651-1656; Gumkowski Dep., RE81 at 103-109, PID3115-3116) Allie Jackson III was retained as Elm's bookkeeper. After a lengthy mortgage assumption was worked out, a closing was held on March 21, 2006 and the deed was transferred. Thereafter, HCI

began paying monthly rent to Elm 411 in the amount of $5,500 – nearly double the original lease amount that HCI was paying when it first took possession of the property and substantially more than the mortgage payment. (J. Flynt Dep., RE78 at 179, PID1680) As Jimmy later learned in mid-2009, to the detriment of HCI/Jimmy, the lease also contained a rent escalation clause and other unfavorable terms to HCI/Jimmy. (*See id.*)   As a result of this real estate transaction, Jimmy/HCI sold a building and began paying significantly higher monthly rent. Between 2006-February, 2014, HCI paid excessive rent well in excess of the building's value.

### B.    The Uncompensated Transfer of Jimmy 100% Interest in Hustler Hollywood Ohio (HH Monroe) Stock to Larry Flynt

Toward the end of 2004, Jimmy was asked/directed to sell/transfer his 100% stock interest of Hustler Hollywood of Ohio, Inc. to Hustler Entertainment, Inc. (i.e., Larry) for an "on paper" transaction price of $150,000. (Jackson Dep., RE89, at 24-26, PID3973-3975) As of this time, Jimmy was President of both entities and in privity with both entities. (J. Flynt Declaration, ¶¶3, 37, PID8616, 8621) This stock transfer request was made at roughly the same time that Jimmy was directed by Cambria to transfer his ownership of the 411 Elm Street property and to begin sending licensing fees from HCI to LFP.  Jimmy was told that this asset transfer was needed in connection with a large commercial loan that was being applied for by Larry in regard to the enterprise. (L. Flynt Dep., RE79, at 58-59, PID2236)

Larry directed Paul Cambria to effectuate this stock transfer. (*Id.*) Attorney Gumkowski was tasked with preparing a stock sale agreement. (Gumkowski Dep., RE81 at 104, PID3115) Jimmy was presented with the stock sale agreement and signed it in California on or about December 15, 2004. (J. Flynt Declaration, ¶ 39, PID8622) Jimmy discussed this stock transfer with Cambria before signing the paperwork. (J. Flynt Dep., RE78, at 180-185, PID1681-1686) Jimmy was not advised that he could refuse to transfer the stock. (*See id.*) Larry has testified in this action that Jimmy could have refused to transfer the stock as Jimmy was the legal owner. (L. Flynt Dep., RE79, at 21, PID2227) Jimmy was not advised that he should seek independent legal advice. (J. Flynt Dep., RE78, at 181-185, PID1682-1686) Jimmy did not have independent legal advice. (*See id.*) There was no negotiation related to the transfer of Hustler Monroe stock and Jimmy was not advised that he could negotiate terms that protected his long term employment, business and/or financial interests. (*See id.*) Mr. Cambria did not advise Jimmy that he did not represent him as to this stock sale or that he should get independent legal advice before transferring such a valuable asset. (Cambria Dep., RE76, at 147-148, PID1264-1265) Jimmy was not counseled to memorialize in writing his business/employment relationship with his brother or to otherwise take steps to put in place a document providing for his financial security before making this transfer. (*See id.*) Jimmy was never advised by Attorneys Gumkowski, Cambria or

any other attorney at the Lipsitz Green firm that Jimmy's interests were not aligned with Larry's or Hustler Entertainment, Inc., that there were potentially non-consentable conflicts of interest, that it was not in his overall best long-term interests to transfer the HH Monroe, Inc. stock, or that he was making such transfer as an at-will employee. (*See id.*)  At no time was Jimmy asked to sign off on any type of conflict waiver nor was he otherwise told that Larry's interests and his interests were in conflict or potentially in conflict. (*See id.*)

As of December of 2004, the Hustler Hollywood of Ohio, Inc. shares had a market value well above the $150,000 transaction price.  According to Plaintiffs' retained economic expert, Don Fritz, the stock had a value of approximately $7,275,000 as of this time.  (*See, generally*, Fritz Dep., RE80, and report, RE80-1, PID2361)  At the time, the Hustler Hollywood store was generating approximately $5,000,000 in sales revenues and realizing yearly profits between $1,200,000-$2,000,000.  (J. Flynt Dep., RE78, at 182, PID1683; Fritz Expert Rep., RE80-1, at PID2359)  It remained the most profitable of the Hustler retail stores. Notwithstanding the fact that $150,000 was not even close to the true value of the Hustler Hollywood of Ohio, Inc. stock, Jimmy was never actually paid that amount.  Although a check was written for that amount, Jimmy passed that money back to LFP/HUSTLER through Hustler Cincinnati, Inc. in the form of "licensing

fees" which had not previously been made. (J. Flynt Dep., RE78, at 181-182, PID1682-1683; Jackson Dep., RE89, at 26, PID3975)

After transferring the Monroe stock, Jimmy transitioned his employment status to LFP and then eventually to Flynt Management Group. (Jackson Dep., RE89 at 28, PID3977) Jimmy was not advised by Mr. Cambria or any of the Defendant attorneys that he was becoming an at-will employee to Larry/LFP/FMG, that he had no job security and that he could be terminated without severance or compensation. (Cambria Dep., RE76, at 147-148, PID1264-1265)

### C. HCI Begins Paying Monthly Licensing Fees to LFP in 2004-2005 at the Advice of Cambria

At no time was a written or oral "licensing" agreement put in place between Larry and Jimmy or between Hustler Cincinnati and any Hustler-related entity as to the use of any "Hustler" trademarks or intellectual property by the Hustler Cincinnati store, which opened at 411 Elm Street in March of 2000. (J. Flynt Declaration, ¶ 25, PID8620) Likewise, there had been no licensing or royalty agreements in place between Jimmy and Larry or between Hustler News & Gifts, Inc. and any HUSTLER-related entity during the time that Hustler Books Magazines and Gifts was in operation between October of 1997 and late 1999. (*See id.* at ¶12, PID8618; *see also* Opinion and Order re Trademark Issues, *Flynt I*, RE187, at 4, PID8770)

In connection with transferring ownership of the 411 Elm Street realty and in an effort to "protect" Larry from criminal prosecution in Hamilton County by distancing Larry from the downtown Hustler store, Defendant Cambria directly advised, counseled and directed HCI/Jimmy to begin paying licensing fees/royalties beginning in or around late 2004. (Jimmy Deposition, RE78, at 175-176, PID1676-1677; Cambria Dep., RE76-1, PID1303)  Cambria also counseled Jimmy and his sons as to the best way to "market" HCI.  (*Id*. at PID1304) Attorney Gumkowski drafted a licensing agreement between HCI and LFP dated November 1, 2004 but that agreement was never signed.  (*See* Gumkowski Dep., RE81 at 105, PID3115)   Neither Cambria nor any LG Attorney advised HCI/Jimmy as to the risks of making monetary "licensing" transfers with respect to established tradename/trademark rights.  (*See, generally*, *id.*)  Ultimately, in *Flynt I*, it was held that Jimmy/HCI became an implied licensee and lost all rights to the Hustler Cincinnati name by virtue of making these "licensing" payments.  (*See* Opinion and Order re Trademark Issues, *Flynt I*, RE187, at 22, PID2788)

## V.     Email Communications between Cambria and Jimmy (2004-2006)

Although the vast majority of communications between Cambria/Defendant Attorneys and Jimmy have been oral over the years, Plaintiffs have independently obtained select email communications which are partly reflective of the nature of

27

communications between Jimmy and Cambria between 2004-2006. (*See, e.g.*, RE 76-1, PID1297-1337)

As reflected by the emails contained therein, Cambria communicated with Jimmy as a principal, constituent, friend and as a decision maker rather than a rank and file at-will employee. For example, in late 2005, Cambria requested Jimmy's assistance in terminating/firing Hustler's newly-appointed/hired President, Tyler Goldman, due to Cambria's perception that Mr. Goldman was interfering with and/or jeopardizing his relationship with "key persons" within HUSTLER/LFP. (*Id.* at PID1310) In an email dated August 24, 2004, Cambria identified himself as "part of the family" and Jimmy's attorney when giving advice to Jimmy concerning marketing at the Monroe store. (*Id.* at PID1302) ("It is a great idea, you better include your lawyer there since I am now part of the family.")

## VI. Defendants' Drafting of Proposed Pension Plan and Advice to Jimmy Regarding Human Resources Matters

In 2006, the Lipsitz Green firm drafted a proposed 401K/Pension plan for HCI and provided counsel to Jimmy regarding HCI's retirement plan. (*See* Reina Dep., RE84-1, PID3542; A. Jackson Dep., RE79, at 92, PID4041) Jimmy was also provided legal counsel by a Lipsitz Green attorney regarding his pension options.

In or around February, 2006, Jimmy terminated a manager of the Hustler Hollywood store in California, Chris Thornberry. This was after Jimmy sought advice from Cambria. (*See* RE76-1, PID1318) Mr. Thornberry then commenced a

28

discrimination action.  Cambria and Lipsitz Green provided legal counsel to Jimmy in connection with Mr. Thornberry's claim/action, which was ultimately settled. (J. Flynt Dep., RE78, at 203-205, PID1704-1706) Cambria had communications with Thornberry's attorney on Jimmy's behalf and also hired a local California attorney to assist in Jimmy's defense.  (*See id.*)

### VII.   2009 - Squeeze Out / Adverse Action Taken by Defendants Against Plaintiffs

Beginning in early 2009, following a dispute between Larry and his nephews, Defendant attorneys orchestrated and set in motion a comprehensive plan to financially devastate their own clients - Jimmy/HCI.  Amazingly, all of this was done pursuant to Lipsitz Green Client ID No. 11740, the same client number that had been used to provide legal services to Jimmy over the years. The record evidence clearly establishes that Lipsitz Green devised a plan to terminate Jimmy's employment, to bring an eviction action against HCI, and to bring a trademark infringement action against HCI (and Jimmy):

> Q.   Did Mr. Cambria make the decision to open the Hustler Hollywood Store in Cincinnati?
> A.   I just – he finally decided to come on and take over my company.  I had an agreement with him in the very beginning that if he wouldn't try to run my company, I wouldn't try to run his law firm.  But finally I lost that, I fear.

(Larry Flynt Dep., RE79, at 34, PID2230; *see also* Larry Flynt Depo. in *411 Elm v. HCI*, RE97, at 27-29, PID5276-5279)

29

Although the eviction action was ultimately unsuccessful, the trademark action was successful. A competing Hustler store was allowed to open up within blocks of HCI's downtown business (Larry Flynt Dep., RE79, at 34, PID2230) and HCI/Jimmy lost the right to continued use of the Hustler name. This was as a consequence of the licensing payments that Jimmy began paying pursuant to the advice of Cambria, the written licensing agreement Defendant Gumkowski drafted in 2001 related to HH Monroe, and as a result of licensing payments that Jimmy began paying through HCI in early 2005 based on the uninformed advice and counsel of Cambria and Gumkowski:

> Larry and Jimmy indisputably entered into an implied licensing arrangement by their conduct. Jimmy may have initially used the "Hustler" mark for HNG and Hustler Cincinnati with Larry's implicit permission and for free. But, whatever their original arrangement, it changed by mutual consent and without protest when Jimmy acquiesced with Larry's wishes, and restructured the relationship between Hustler Cincinnati and LFP. Thereafter, Hustler Cincinnati paid licensing fees for years to LFP, uninterrupted and without protest, until family dynamics soured their relationship and Jimmy refused to pay.

(Memorandum Opinion and Order, Flynt I, RE187, at 13-14, PID8779-8780)

With regard to Jimmy's termination, it was determined that Jimmy was an at-will employee at the time of his termination due to the absence of a written contract as to his employment rights and business relationship with his brother. (*See id.* at RE235, PID9916-9917)

30

## SUMMARY OF THE ARGUMENT

This diversity jurisdiction action for legal malpractice stems from the civil and criminal representation of Plaintiffs by the Defendant attorneys and law firm over the course of more than 30 years.   Brothers Larry and Jimmy Flynt maintained a close confidential business relationship for the better part of 40 years, between 1969 and 2009.  Larry and Jimmy were criminally prosecuted together on four separate occasions in Ohio between 1976 and 2004. This included two separate prosecutions for obscenity, in Cleveland and Cincinnati, in the mid-1970s. Each of these prosecutions stemmed from the sale and distribution of Hustler magazine.   In 1998, Larry and Jimmy were again prosecuted for obscenity in Hamilton County.  These charges stemmed from the sale of alleged pornographic videos to a minor at a Hustler retail store (Hustler News & Gifts) which opened on 6th street in late 1997.  There was an attempt to bring additional criminal charges against Larry and Jimmy in 2003-04 in Hamilton County.  Those charges stemmed from the alleged sale of adult merchandise at the Hustler Cincinnati store which opened in early 2000 at 411 Elm Street in downtown Cincinnati.

Defendant Attorney Paul Cambria, employed by Defendant Lipsitz Green, a New York based law firm, provided legal representation to Jimmy, and was counsel of record, in connection with all four criminal prosecutions. Cincinnati-based attorney Lou Sirkin served as local counsel for the 1998-99 and 2003-04

matters. Defendants' representation of Jimmy did not conclude with, and was not limited to, the criminal representations, all of which arose out of Jimmy (and Larry's) business activities related to Hustler. Mr. Cambria maintained a continuous attorney-client relationship with Jimmy between 1998 and 2009. During that time period, Mr. Cambria (and Defendant Attorneys Deal, Gumkowski, and Reina) drafted various legal instruments for Jimmy and his wholly owned businesses, provided legal advice and counsel, and had confidential communications and dealings with Jimmy related to his business and financial interests and his personal criminal exposure arising from his employment and business activities. It is undisputed that Jimmy had a 100% interest in several Hustler retail stores/entities during this time period, and that Defendants provided legal services to those entities. In 2009, after a dispute arose between Jimmy and Larry, Mr. Cambria and the Defendant attorneys took Larry's side and thereafter orchestrated and carried out a comprehensive plan to cause complete economic ruin to their former clients, Jimmy and his wholly-owned business, HCI. Defendants violated their professional duties to Plaintiffs and tortuously caused catastrophic harm.

The district court dismissed Plaintiffs' legal malpractice claims, reasoning that there was no evidence of an attorney client relationship between Plaintiffs and Defendants. The district court's decision is not supported by the evidence. Not

only is it undisputed that Plaintiffs represented Jimmy Flynt personally in all four criminal prosecutions, both Jimmy and his accountant, Allie Jackson, testified that Defendants represented Jimmy and his wholly-owned company, HCI, during the time period of 2001-2009. There is also evidence that HCI/Jimmy contributed toward Defendants' yearly retainer. For these and other reasons, two experts opined in reports and via deposition that an attorney client relationship existed between Plaintiffs and Defendants, and that Defendants' breached the standard of care and their professional duties to Plaintiffs. Thus, this Court should reverse the district court's decision on the legal malpractice claims.

In addition to raising a genuine question of material fact on the legal malpractice issues, Plaintiffs also raised a genuine question of material fact regarding their claims for tortious interference with contractual/business relationships and Jimmy's expectancy interest in Larry's testamentary trust. It is undisputed that Jimmy's pay and benefits were stopped, that Jimmy has received no retirement benefits and that Jimmy was removed from Larry's trust after the instant litigation began in the 2009 timeframe. It can reasonably be inferred from Larry's testimony that the prosecution of the current litigation was made at Defendants' insistence. Moreover, to the extent that the facts show that Defendant Cambria is now a trustee of Larry's trust, Defendants' intent to interfere with

Jimmy's expectancy interest can be further inferred, creating a genuine issue of material fact on that issue as well.

## ARGUMENT

### A.    Standard of Review

This Court reviews summary judgment decisions *de novo*. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Appellants are therefore entitled to a fresh review of the district court's summary-judgment decisions, with all reasonable inferences in their favor. *See Medical Mut. of Ohio v. K. Amalia Enters., Inc*., 548 F.3d 383, 389 (6th Cir. 2008).

### B.    The District Court erred in Granting Summary Judgment Regarding  Jimmy's Legal Malpractice Claims

#### 1.    Plaintiffs Demonstrated a Genuine Issue of Material Fact Regarding a Direct Claim of Legal Malpractice.

In order to establish a cause of action for legal malpractice a plaintiff must establish: (1) the existence of an attorney/client relationship giving rise to a professional duty; (2) a breach of that duty; and (3) damages proximately caused by that breach. *Vahilla v. Hall*, 77 Ohio St.3d 421, 427, 674 N.E.2d 1164 (1997). Simply stated, absent an attorney/client relationship, there can be no claim for legal malpractice. *Id*. The benchmark of the existence of an attorney/client relationship is a recognition that an attorney renders legal advice and services to a client and that the client relies upon the advice and services of the attorney. *Sayyah v. Curtell*

34

143 Ohio App.3d 102, 111, 757 N.E.2d 779 (2001). For the attorney/client relationship to form, all that is necessary is for a client to reasonably believe that he or she entered into a confidential relationship with the attorney. *Lillback v. Metro Life Ins. Co., LPA*, 94 Ohio App.3d 100, 109, 640 N.E.2d 250 (1994).

Ohio courts have consistently held that it is the reasonable belief of the client that will govern whether an attorney/client relationship has been established. *Carnegie Cos., Inc. v. Summit Properties, Inc*., 183 Ohio App.3d 770, 781, 918 N.E.2d 1052, 2009-Ohio-4655 (2009); *see also Henry Filters, Inc. v. Peahody Barnes, Inc.*, 82 Ohio App.3d 255, 261, 611 N.E.2d 873 (1992) ("[T]he ultimate issue is whether the putative client reasonably believed that the relationship existed and that the attorney would therefore advance the interests of the putative client.").

The subjective beliefs of the lawyer are largely irrelevant to the analysis, because the "law does not look to the reasonable expectations of the lawyer in order to determine whether an attorney/client relationship has been established by implication. The law focuses on the 'reasonable expectations of the person seeking representation.'" *Carnegie Cos., Inc. v. Summit Properties, Inc*., 183 Ohio App.3d at 782 (quoting *Cuyahoga Cty. Bar Assn. v. Hardiman*, 100 Ohio St.3d 260, 262, 798 N.E.2d 369, 2003-Ohio-5596 (2003)).

The district court issued summary judgment in favor of Defendants after it concluded that no attorney-client relationship existed between Plaintiffs and

Defendants.   This conclusion ignores a flood of evidence to the contrary. Defendant Cambria clearly had an attorney-client relationship with Jimmy.   For instance, it is undisputed that Cambria was the longstanding attorney of record for Jimmy in at least four separate criminal prosecutions in Ohio between 1976 and 2004.[3]   Each of those prosecutions stemmed from Jimmy's role or involvement with the business operations of a Hustler entity in which he had ownership interest.

Defendants have acknowledged that they never advised Jimmy that they ceased being his attorneys beginning in 2001 or that the attorney-client relationship had terminated.   (*See, e.g.*, Cambria Dep., RE76 at 150, PID1265)  As Plaintiffs' expert, Geoffrey Stern, has testified, all presumptions related to the attorney-client relationship flow to the client/putative client.   (Stern Depo. RE94, at 324, PID4859) ("The client is the one who gets the benefit of all presumptions.")  It is not as though Mr. Cambria started as Larry's attorney or LFP's corporate counsel, and then Jimmy formed a belief that Mr. Cambria became his by virtue of his employment with the corporation.  Rather, to the contrary, Cambria started as Jimmy's attorney during the criminal prosecutions beginning in the 1970s, and

---

[3] *See, e.g.*, Cambria Dep., RE76, at 45, PID1238 (1976 Obscenity Prosecution); *Id.* at 60-65, PID1242-1243 (1998 Obscenity Prosecution); *Flynt v. Deters¸* Hamilton County Common Pleas Court Case No. 9803819 (related civil action against Hamilton County Prosecutor related to 1998 litigation); J. Flynt Dep., RE78, at 134, PID1635, Pleadings from Hamilton County Court of Common Pleas, Case No.: B9802210-B, RE99-3, PID5442-5457 (2004 Prohibition action to enjoin re-prosecution of Jimmy and Larry related to 1998 criminal case).

then ultimately took on a larger role with regard to Jimmy, Larry, and LFP during the formation of the retail stores. Jimmy has testified that he was personally involved with the meetings and communications in late 2000/early 2001 when Mr. Cambria was retained pursuant to a retainer agreement. (J. Flynt Dep., at 29, RE78, PID1530) (Testifying that he was present at a series of meetings at the Four Seasons hotel in Los Angeles where the retainer was negotiated) Jimmy, and his accountant, Allie Jackson, were advised that the retainer agreement included Jimmy and his wholly-owned entities. (*Id.* at 147, PID 1648; Jackson Dep., RE89, at 97, PID4046) In fact, Jimmy testified that this retainer agreement included representation of Jimmy and Larry individually, as well as all the corporate entities with which Jimmy and Larry were affiliated. (J. Flynt Dep., RE78, at 147, PID 1648) ("[Cambria] represents counsel, he represents the corporation, he represents Larry, he represents me.") Cambria admittedly never did anything to inform Jimmy that he would no longer be representing him personally outside the criminal prosecutions, or providing him with any counsel or legal advice and that his loyalties would strictly flow to Larry/LFP from that point forward. (Cambria Dep., RE76 at 147-148, 150, PID1264-1265) Jimmy therefore reasonably believed that his lawyer would continue to be his lawyer.

Defendants drafted numerous legal instruments on behalf of Jimmy/HCI. (*See* Attachments to Gumkowski Dep., RE76-1, PID1297, 1299; J. Flynt Dep.,

RE78, at 118-119, PID1619-1620; RE99-3, PID5442-5457) Defendants never advised Jimmy or HCI that they were not their clients. (Cambria Dep., RE76 at 150, PID1265) Defendants never sent any type of engagement letter to Jimmy (or Larry). Despite an extensive factual record in the trial court spanning thousands of pages, Defendants have been unable to produce even a single document that specifically defined the scope of services to be provided by Cambria or Lipsitz Green pursuant to the retainer agreement. According to Defendants, their "client," after 2001, has essentially included nearly everything that Larry owned or controlled. (*See* Cambria Dep., RE76, at 117-120, PID1256-1257) Larry has even testified that the retainer agreement included HCI and HH Monroe. (L. Flynt Depo., RE79, at 78, PID2241) In fact, Larry believed that he always had an ownership interest in those two entities, even though Jimmy was the 100% owner of the corporate entities that held and operated them. (*Id.* at 60-61, PID2236-2237)

Plaintiff's attorney experts, Jack Scott and Geoff Stern, have reviewed the entire factual record in this case, and testified by deposition. Contrary to the district court's opinion, both experts testified that they based their opinions on an independent review of the record and not upon any summary of the facts provided to them. (Stern Depo., RE91, at 68, PID4488 (Testifying that he "certainly didn't rely exclusively" on a summary of the facts provided to him); Scott Depo. RE90 at

9, PID4112 (Testifying that he independently verified facts in the record contained in the summary.)

Both experts opined that an attorney-client relationship was formed between Defendants and Plaintiffs and that it did not terminate until 2009 when Defendants began overtly taking adverse action to Jimmy/HCI. Geoff Stern is the former disciplinary counsel for the State of Ohio and is widely viewed as one of the leading experts on attorney standards and ethics. Mr. Stern submitted a detailed written report which contains his opinions and also submitted to a lengthy deposition. (*See, generally*, RE91, 92 (deposition testimony), RE91-3, PID4740-4772 (expert report)) Mr. Stern concluded that there was an attorney client relationship between Defendants and Jimmy in his personal and corporate capacities as an owner of retail stores from the 2001-2009 timeframe. Stern Depo., RE91, at 78-79, PID4498-4499) Mr. Stern confirmed that this conclusion was based, in part, not on any assumed summary of facts, but from a review of Jimmy's testimony. (*See id.* at 79, PID4499) Further, Mr. Stern reviewed the record and opined that Defendants drafted documents for Jimmy, a further indicia of the existence of the attorney client relationship. (*See id.*; *see also id.* at 88, PID4508) Mr. Stern specifically pointed to the lease/licensing agreements for the retail stores as a specific instance of drafting documents and providing legal advice to Jimmy and HCI. (*Id.* at 88-89, PID4509-4508) Mr. Stern further indicated that due to

Jimmy's 100% stock ownership in those stores, Jimmy's perception that the legal advice was rendered to him both in a corporate and personal capacity was a reasonable one. (*See id.*)

Similarly, Jack Scott, an Ohio attorney with extensive experience, has submitted an expert report and testified by way of deposition. (*See, generally*, RE90 (deposition testimony), RE90-3, PID4418-4420 (expert report))  Mr. Scott also concluded that there was an attorney client relationship between Defendants and Jimmy in his personal and corporate capacities as an owner of retail stores from the 2001-2009 timeframe. (Scott Depo., RE90, at 40, 76, PID4143, 4179)  Mr. Scott confirmed that this conclusion was based not on any assumed summary of facts, but from a review of Jimmy's testimony. (*See id.* at 79, PID4499)  Mr. Scott also specifically pointed to solicitation of advice and drafting of documents as indicia of the relationship between Defendants and Jimmy in his personal and corporate capacities as owner of the retail stores. (*Id.* at 82-83, PID4185-4186)  Mr. Scott further indicated that due to Jimmy's 100% stock ownership in those stores, Jimmy's perception that the legal advice was rendered to him both in a corporate and personal capacity was a reasonable one. (*See id.*)

Despite the abundant evidence of an express or implied attorney client relationship between Defendants and Plaintiffs, the district court concluded that no such evidence existed.  To support this conclusion, the district court relied on

Jimmy's testimony that he believed, in part, that Defendants' representation of him was based on his belief that he was a business partner with Larry. (Memorandum Opinion, RE106, at 8, PID5517) (citing J. Flynt Dep. at 43)). In the district court's view, this belief was erroneous, as the district court had separately held that there was no business partnership between Jimmy and Larry. (*See id.*) Moreover, the district court concluded that "Jimmy never testified that Larry specifically told him that Cambria would represent Jimmy and HCI." (*Id.*)

In the first instance, the district court was incorrect to conclude that Jimmy never testified as to direct knowledge of the retainer agreement's scope. Jimmy testified that he was present for the negotiation of the retainer agreement over multiple meetings at the Four Seasons Hotel in Los Angeles, establishing that he had personal knowledge of the scope of the retainer. (J. Flynt Dep., RE78, at 28-44, PID1529-1545) He also testified unequivocally that personal representation of him and his stores was included within the scope of that agreement:

> Q.  I take it you don't dispute that Paul [Cambria] is general counsel to Larry and the LFP?
> A.  He's also counsel for me and Larry.
> Q.  You agree that he is general counsel to Larry and LFP; correct?
> A.  And also me.
> Q.  I'm not going to stop you from answering that you think that, but at least you think he does represent Larry?
> A.  He represents counsel, he represents the corporation, he represents Larry, he represents me.

(J. Flynt Dep. RE78, at 147, PID 1648)  When construed most strongly in Jimmy's (and HCI's) favor, there can be no doubt that Jimmy has provided sufficient testimony to create a question of fact that he entered into an express oral agreement with Defendants for legal representation.

The district court's reasoning with respect to the prior partnership decision does not change this result.  The district court apparently believed that the holding that Jimmy and Larry were not business partners *with respect to ownership of Larry Flynt Publications* was somehow dispositive of the issue.  (*See* Memorandum Opinion in 1:09-cv-00913, RE165, PID8239) ("At stake in this dispute is a 50% partnership interest claimed by Jimmy **in the entire Hustler enterprise**, comprised of a myriad of corporations and owning several valuable properties, including the Hustler trademarks.") (emphasis added)  Respectfully, the conclusion that the partnership decision prevents success in this action does not follow from the holding of the partnership decision.   Specifically, the district court concluded that there was no evidence of a partnership *in LFP, Inc*.  (*See id.* at PID8253)  Importantly, the district court recognized Jimmy's ownership of HCI and his prior ownership of the Hustler Hollywood store in Monroe before he transferred the stock in 2004-05.

The district court also claimed that there was no support in the testimony of HCI's accountant, Allie Jackson, for the existence of an attorney client relationship

42

between HCI or Jimmy and Defendants.  To the contrary, Mr. Jackson testified that

Defendants performed legal work for Jimmy and HCI, and that they were

represented by Defendants along with other counsel:

> Q.     And why would you have provided information that may have
>        been requested by – by Paul Cambria or anyone at Lipsitz
>        Green?
> MR. PARKER:  Objection.
> THE WITNESS:  Because we had dealt with them in the past.
> Q.     Did you view them as the lawyers for Hustler Cincinnati?
> A.     I wouldn't -- I don't know if I would classify it as the lawyers.  I
>        would classify it as a lawyer that did work for us, yes.

(*See* Jackson Dep., RE89, at 97, PID4046).  In addition to the testimony of Allie

Jackson, there was evidence of payment for legal services for Defendants' work by

HCI.  Mr. Jackson testified that at least some invoices were billed from Defendants

to HCI directly, and that others were paid to LFP in California for Defendants'

services in connection with the retainer agreement.  (*See id.* at 93, PID4042)  There

is also correspondence suggesting that Mr. Jackson communicated directly with

Defendants regarding billing and invoices.  (*See* RE76-1, PID1299, June 10, 2003

correspondence from Jackson to Cambria regarding "copies of invoices" that had

previously been discussed.)  It is further undisputed that at least some bills were

paid directly to Defendants, as Plaintiffs introduced a 1099 for Defendants as a

vendor of Hustler Hollywood Ohio, Inc., one of the retail operating companies

owned by Jimmy.  (*See* Ex. 14 to Gumkoski Dep., RE81-4, PID3196-3197).

43

Mssrs. Stern and Scott have opined, based on the factual record, that the Defendant attorneys breached the standard of care and committed multiple violations of their ethical and professional duties to Plaintiffs. (*See* Expert Reports, authenticated by testimony, RE91-3, PID4740-4772, RE90-3, PID4418-4420) Specifically, Messrs. Stern and Scott have opined that Defendants attorneys negligently failed to disclose or clear conflicts of interest, breached their duties of loyalty, independence and confidentiality. (*See id.*) Without adequate disclosure and without independent legal counsel, Jimmy signed away millions of dollars of assets pursuant to unfavorable legal contracts/instruments prepared by Defendants. Jimmy signed these agreements without adequate representation or full disclosure and with the reasonable belief that Defendants were his counsel and that his legal interests were being protected. Unsurprisingly, Mr. Scott testified that these actions would have been baffling had Jimmy not been operating under the belief that Defendants were not protecting his interests:

> Q.      You go on to say, Paul Cambria knew or should have known that Jimmy believed that he had an ownership interest in the Hustler enterprise as a family enterprise and/or the Hustler retail chain.
>
>      On what basis should Paul Cambria have known that, prior to 2009 when Jimmy testified to it?
>
> A.      Because I don't understand any other reason why Jimmy would enter into the deal he did for the Monroe store or the downtown Cincinnati store.
>
>      He had -- in my opinion, he had to -- Jimmy had to believe that there was some reasonable expectation this is being done in the furtherance of the Hustler business, whether or not

44

it's to – it's to protect Larry's California gaming license, insulate Larry from prosecution in Cincinnati.

You don't do these type of -- enter in these type of transactions on an arm's length basis without some understanding that there's a bigger picture here.

That's my fundamental opinion as to what's wrong with this transaction, is if an attorney walks in the door and consults with me and says, this is the deal that's been proposed to me, is this okay to do? I'm going to be saying, time out. You have a ten-year lease in Monroe and you're going to double it. And you have -- you have a lease in Cincinnati and you're going to increase those lease payments. And you're going to pay royalty payments that you've never paid before. Why are you doing this? It's my brother.

There's – there's -- has to be – there's a missing link here   as to why would you do it.

(Scott Dep., RE90, at 219-220, PID4322-4323)

The Sixth Circuit has recently reversed and remanded summary judgment in favor of a law firm in a legal malpractice action involving allegations of non-consentable conflicts of interest, inadequate disclosure, lack of informed consent and mutual representation of potentially adverse clients without proper disclosure. *See CenTra, Inc. v. Estrin*, 538 F.3d 402 (2008). Here, to the extent that Jimmy and Larry's interests were adverse in connection with the various asset transfers, Defendant attorneys had a duty to adequately disclose those conflicts, provide full disclosure as to their loyalty and representation and mandate that Jimmy obtain independent legal advice. Defendants have all acknowledged that no such disclosure was ever made.

45

As a consequence of Defendants' breach of duties to Plaintiffs, a trademark infringement action was successfully prosecuted against them resulting in a Permanent Injunction and significant monetary losses.    As a consequence of Defendants' breach of duties, Jimmy was terminated in 2009, lost all pay and benefits, and was adjudicated to have no employment rights due to the lack of a written agreement.    Jimmy was also deprived his retirement benefits which had been orally promised to him by his brother.    As a consequence of Defendants' breach of duties, Jimmy/HCI were divested of millions of dollars of assets without proper compensation.    When Jimmy transferred the stock of the Hustler Hollywood store in Monroe for $150,000, which he did not ultimately retain, the stock had a fair market value of $7,275,000.    (*See* report and testimony of Don Fritz, RE80; Expert Report, RE80-1, at PID2361)

When all of the factual allegations are accepted as true, and all reasonable inferences are drawn in Plaintiffs' favor, Plaintiffs have sufficiently pled a claim for direct malpractice against Defendants based on the express and/or implied formation of an attorney client relationship with Defendants. As a result, this Court should reverse the district court's judgment on the legal malpractice claims and remand this matter for trial.

### 2. Plaintiffs Raised a Genuine Issue of Material Fact Regarding Indirect Claims for Legal Malpractice

Under Ohio law, attorneys have qualified immunity from liability to third parties for acts or omissions concerning the representation of a client **unless** such third person is in ***privity*** with a client of the attorney **or** the attorney acts ***maliciously***. *LeRoy v. Allen, Yurasek & Merklin*, 114 Ohio St.3d 323, 326, 872 N.E.2d 254 (2007) (citing *Scholler v. Scholler*, 10 Ohio St.3d 98, 462 N.E.2d 158 (1984). Therefore, in addition to owing a duty of reasonable care to clients (arising from the attorney-client relationship), lawyers are also subject to liability to third parties in Ohio under a malpractice theory in two specific circumstances, neither of which require the existence of an attorney-client relationship. *Scholler*, 10 Ohio St.3d at 103-104.   In fact, these "third-party" duties and potential liabilities exist in the absence of an attorney-client relationship between the lawyer and the third party.   Both of these third-party theories of recovery were pled by Plaintiffs. Based on the record evidence, reasonable minds could conclude that Jimmy/HCI were in privity with Larry, LFP, Hustler Entertainment, Elm 411, Lakeville Properties, Hustler Entertainment, Inc. and/or one or more other LFP/Trust entities which gave rise to a duty of reasonable care which was breached.

### i. Plaintiffs were in privity with defendants.

The first scenario in which a third-party has standing to sue a lawyer for malpractice under Ohio law is where the third party is, or was, in privity with a

client of the attorney.  In legal malpractice nomenclature, this is known as the "privity exception."  *See Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987); *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 887 N.E.2d 1167, 2008-Ohio-2012 (2008).   Black's Law Dictionary defines privity as "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter."  Black's Law Dictionary, 1237 (8th Ed. 2004). In determining privity in the context of standing to bring a malpractice claim, the court must determine whether the parties' interests are the same, such that representing the client is equivalent to representing the party alleging privity with the client.  *See Scholler*, 10 Ohio St.3d at 103-04.  "For legal malpractice purposes, privity between a third person and the client (of the attorney against whom a malpractice claim is asserted) exists where the client and the third person share a mutual or successive right of property or other interest."  *Sayyah v. Cutrell*, 143 Ohio App.3d 102, 111-112, 757 N.E.2d 779 (2001).

If Jimmy/HCI were not clients of Defendants after 2001, reasonable minds could conclude that Jimmy/HCI were in privity with Defendants' clients, namely Larry and one or more of the various LFP/Trust entities, in connection with the various asset transfers challenged in this action.  That is, assuming *arguendo* that Defendants did not owe duties to Plaintiffs as clients with respect to the disputed asset transfers, then Defendant attorneys owed duties to Plaintiffs by virtue of

48

Plaintiffs being in privity with Larry, to include the alleged "on paper" entities involved in said transactions – HH-Entertainment, Inc. (regarding transfer of shares/ownership of Hustler Hollywood of Ohio, Inc.); Elm 411, LLC (transfer of real property, and lease back, of real property at 411 Elm Street); and L.F.P., Inc., (transfer of exaggerated lease and license payments by Jimmy, through HCI and Hustler Hollywood of Ohio, Inc.).

Larry has claimed repeatedly that Jimmy was not the true owner of the Cincinnati and Monroe Ohio stores, but a "straw man" or nominee standing in Larry's place.  (*See, e.g.*, L. Flynt Dep. RE97, at 120-121, PID2249-2250) If Jimmy was simply Larry's straw man in connection with the Hustler store in Monroe, then Jimmy was in privity with Larry.  There are numerous cases which hold that a nominee or straw agent can be in privity with the principal.  *See, e.g.*, *Dimov v. EMC Mortg. Corp.*, E.D.Tenn. No. 1:11-CV-160, 2012 WL 1071186 (Mar. 29, 2012); *Breinholt v. Aegis Wholesale Corp.*, D.Idaho No. 10-CV-00466-EJL, 2012 WL 2865969 (July 11, 2012); *see also ABS Industries, Inc. ex rel. ABS Litigation Trust v. Fifth Third Bank*, 333 Fed.Appx. 994, 1002 (6th Cir. 2009) (recognizing Ohio's broad definition of privity to defendants who shared mutuality of interest).  Thus, Defendants raised a genuine issue of material fact regarding an indirect claim for legal malpractice based on Plaintiffs' privity with Defendants' other clients.

### ii.    The malice exception.

The second scenario recognized by Ohio law, where a lawyer is subject to liability to a third party is where the lawyer acts with fraud, bad faith, collusion, or malice toward a third party.  This is known as the "malice exception."  *Shoemaker*, 118 Ohio St.3d at 228.  The malice exception does not require any type of privity to be established.  *Id.*  "The contours of the malice exception for attorney immunity to third party claims are not brightly drawn."  See *Wilkey v. Hull*, 598 F. Supp. 2d 823, 832 (S.D. Ohio 2009).  The Ohio Supreme Court has suggested that an attorney acts maliciously if he acts with intent to defraud a third party, or with "malice" or "bad faith," but did not amplify those terms.  *See id.* (citing *Zipperstein*, 32 Ohio St.3d 74).

The Ohio Supreme Court has held that a plaintiff's allegations of an attorney's collusion and conflict of interest were sufficient to defeat dismissal of a third-party malice claim under Ohio Rule 12(b)(6).  *LeRoy*, 114 Ohio St.3d at 330 (stating that the civil rules permit malice to be pled generally).   In the context of legal malpractice actions, "malice" includes those acts of an attorney taken with an ulterior motive separate and apart from the good-faith representation of the client's interests.  *Ryan v. Wright*, 10th Dist. No. 06AP-962, 2007-Ohio-942, 2007 WL 661815, *3 (Mar. 6, 2007) (citing *Hahn v. Satullo*, 156 Ohio App.3d 412, 2004-Ohio-1057).  In this context, Ohio's Second District has noted that malice may also

50

imply "[a] condition of mind which prompts a person to do a wrongful act willfully, that is, on purpose, to the injury of another without justification or excuse." *Moffitt v. Litteral*, 2d Dist. No. 19154, 2002-Ohio-4973, 2002 WL 31105394, *12 (Sept. 20, 2002) (internal citation omitted).

Beginning in early 2009, Defendant attorneys began taking actions adverse to Plaintiffs.    Such action was improper and violated ethical cannons and rules. Defendants began taking action, motivated by self-interest, against their own clients (Jimmy/HCI) in an effort to preserve their large "retainer agreement" and relationship with Larry/LFP.  Defendants, specifically Cambria, also began to take action adverse to Jimmy in an effort to better position himself to have increased power, control and influence over the Hustler Enterprise in the years ahead. Between February, 2009 and November, 2009, Defendant attorneys, among other things, participated in, suggested, encouraged and orchestrated the wrongful cessation of Jimmy's pay and compensation, Jimmy's termination and loss of benefits without any severance or compensation, Jimmy's removal from the Larry Flynt Trust, the initiation of an eviction action and trademark infringement action HCI, the pursuit of a competing Hustler retail store in downtown Cincinnati, the filing of a show cause motion seeking to hold Jimmy in contempt for invoking his Fifth Amendment privilege, and the attempted theft/fraudulent inducement of HCI to send $400,000 to Larry under false pretenses.  (Larry Flynt Dep., RE79, at 34,

PID2230; *see also* Larry Flynt Depo. in *411 Elm v. HCI*, RE97, at 27-29, PID5276-5279)  These actions were part of a comprehensive plan to cause complete economic ruin to Plaintiffs which, to date, has been successful.  Defendants did not even address the malice exception in their Motion for Summary Judgment below. Plaintiffs respectfully submit that reasonable minds could conclude that the malice exception is applicable to the facts of this case.

### C.  Reasonable Minds Could Conclude that Defendants Tortiously Interfered With Plaintiffs' Contractual Relations, Business Relations & Expectancy Interests

The Ohio courts, including decisions by the Supreme Court of Ohio, Ohio Court of Appeals, District Courts for the Northern and Southern Districts of Ohio, and the Sixth Circuit Court of Appeals (when construing Ohio law), recognize two distinct species of claims for tortious interference: (1) interference with a *contract*; and (2) interference with a *business relationship*. *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1040-41, 1043-44 (N.D. Ohio 2003) ("Ohio law recognizes both the tort of intentional interference with a contract and the tort of intentional interference with a prospective contractual relationship."); *Chandler & Assocs. v. America's Healthcare Alliance*, 125 Ohio App.3d 572, 709 N.E.2d 190, 198 (1997) ("[T]ortious interference with a contractual relationship which, although similar in form, is distinguishable from the substantive law of tortious interference with a business relationship.").  The main distinction between these

two claims is that a claim for interference with a contract applies only to contracts that are *not* terminable at will, but a claim for interference with a business relationship applies to both "prospective contractual relations not yet reduced to a contract" and contracts or agreements terminable at will. *Diamond Wine & Spirits v. Dayton Heidelberg Distrib. Co*., 148 Ohio App.3d 596, 774 N.E.2d 775, 780-81 (2002); *Lapping v. HM Health Servs*., No. 2000-T-0061, 2001 WL 1602683, at *8 (Dec. 14, 2001) (citing *Reagan v. Ranger Transp., Inc*., No. 97-P-0102, 1998 Ohio App. LEXIS 5824, at *16 (Ohio Ct. App. Portage County Dec. 4, 1998)).

The Supreme Court of Ohio has adopted Section 766 of Restatement (Second) of Torts and has set forth five elements to establish tortious interference with a contract or business relationship: (1) the existence of a valid contract **or** business relationship between a plaintiff and a third party; (2) the defendant's knowledge of the contract or business relationship; (3) the defendant's intentional inducement of the breach or termination of the contract or business relationship; (4) the defendant's engagement in improper and unprivileged conduct (e.g., the commission of a fraud or breach of a fiduciary duty); and (5) damages resulting from the defendant's actions. *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St.3d 1717, 707 N.E.2d 853, 858 (1999); *Kenty v. Transamerica Premium Ins. Co*., 572 Ohio St.3d 415, 650 N.E.2d 863, paragraph two of the syllabus (1995) (setting forth same elements); *see* RESTATEMENT (SECOND) OF TORTS § 766 (1979)

("One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.").   To prove a claim of interference with a business relationship, a plaintiff **does not need** to have a binding, executed contract.  *Fred Siegel Co.*, 707 N.E.2d at 861 (ruling that the trial court erred in awarding summary judgment against the plaintiff-law firm's tortious interference claim, even though plaintiff had only business relationships (rather than contracts) with its clients).   The existence of a current business relationship or a potential business relationship is sufficient. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 651 N.E.2d 1283, 1294 (1995)*; Gray-Jones v. Jones*, 137 Ohio App.3d 93, 738 N.E.2d 64, 69-70 (2000).  For example, a business relationship exists when a plaintiff has an "understanding" with a third party that the plaintiff would perform certain work for the third party.  *Cooper v. Jones*, No. 05CA7, 2006 WL 895210, at *1 (Mar. 29, 2006) (reversing the award of summary judgment in favor of defendant; understanding between plaintiff and railroad company "established a business relationship," although any binding contract needed the approval of the city). Because direct evidence of intent is rare, intent to induce a breach or termination

may be "inferred from the totality of the circumstances." *Davis v. Sun Ref. & Mktg. Co.*, 109 Ohio App.3d 42, 671 N.E.2d 1049, 1059 (1996). Circumstantial evidence is often used to establish the intent element of other intentional torts. *See, e.g.*, *Doyle v. Fairfield Mach. Co.*, 120 Ohio App.3d 192, 697 N.E.2d 667, 677 (1997) (finding that circumstantial evidence of intent to defraud plaintiff was sufficient to create an issue of fact); *Davis*, 671 N.E.2d at 1059 (finding that the trial court properly inferred an intent to mislead "from the totality of the circumstances" (*citing Klapchar v. Dunbarton Props. Ltd.*, No. CA-8521, 1991 WL 249432, at *3 (Nov. 4, 1991)); *State v. Bergsmark*, No. L-03-1137, 2004-Ohio-5753, 2004 WL 2426236, *5 (Oct. 29, 2004) (same). Likewise, the causation requirement may be established by "circumstantial evidence." *Jaro Transp. Servs. v. Grandy*, No. 4:03-CV-01227, 2006 U.S. Dist. LEXIS 62932, at *47 (N.D. Ohio Sept. 5, 2006) (citing *Wauseon Plaza, Ltd. P'ship v. Wauseon Hardware Co.*, 156 Ohio App.3d 575, 807 N.E.2d 953, 964 (2004)); *Hoover v. Curtis*, No. 18580, 2001 Ohio App. LEXIS 2653, at *1-2, *6 (June 15, 2001) (reversing the grant of summary judgment for interferer; "a jury could infer" that defendant's false statements "caused" the termination of plaintiff's employment).

As to the Fourth element, Ohio courts use the "terms improper and without privilege interchangeably." *Wauseon Plaza, Ltd. P'ship.*, 807 N.E.2d at 963 (internal quotation marks and citations omitted). The Supreme Court of Ohio has

adopted the approach of Restatement (Second) of Torts sections 767 and 768, which set forth two separate tests to determine whether a defendant acted improperly and without a privilege.  The seven-factor balancing test of Section 767 of Restatement (Second) of Torts applies: (1) to all contracts *not* terminable at the will of the parties; and (2) to business relationships and contracts that are terminable at will when the plaintiff and defendant do not compete.

The seven factors of section 767 are:

> 1. the nature of the actor's conduct;
> 2. the actor's motive;
> 3. the interests of the other with which the actor's conduct interferes;
> 4. the interests sought to be advanced by the actor;
> 5. the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
> 6. the proximity or remoteness of the actor's conduct to the interference; and
> 7. the relations between the parties.

*Fred Siegel Co.*, 707 N.E.2d at 858-860 (adopting RESTATEMENT (SECOND) OF TORTS § 767 (1979)).

Of the seven factors, "[t]he nature of the [defendant's] conduct" is the "chief factor."  *Super Sulky Inc. v. U.S. Trotting A'ssn.*, 174 F.3d 733, 742 (6th Cir. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1977)); *Hicks v. Bryan Med. Group, Inc*., 287 F. Supp. 2d 795, 812 (N.D. Ohio 2003) (citing *Super Sulky*, 174 F.3d at 742). Despite the adoption of the Restatement, the Ohio Supreme Court and other Ohio courts have not defined adequately the contours of

56

what conduct is improper. The Court has explained that the impropriety of a defendant's actions is fact specific and determined "under the circumstances." *Petrovski v. Fed. Express Corp*., 240 F. Supp. 2d 685, 690 n.1 (N.D. Ohio 2003) (noting that the improper element "is not well-defined by Ohio courts"). As a result, the Southern District of Ohio and this Court, have frequently denied 12(b)(6) motions seeking to dismiss claims for interference with contractual or business relationships. *See, e.g., Contemporary Villages, Inc. v. Hedge*, Case No.: 2:05-cv-170, 2005 U.S. Dist. LEXIS 9873 (S.D. Ohio May 24, 2005).

Based on the record evidence, when all inferences are drawn in Plaintiffs' favor, a jury could conclude that Defendants wrongly interfered with Plaintiffs' contractual and/or business relations. Defendants had clear knowledge of Jimmy's long-term employment and business relationship with Larry and interfered with same by encouraging, directing and suggesting that Jimmy's pay and benefits be stopped and that he be terminated without cause. (J. Flynt Dep., RE78, at 192-193, PID1693-1694) A reasonable jury could conclude reasonably that Mr. Cambria was motived to encourage Larry to oust Jimmy from Hustler/LFP so as to ensure Lipsitz Green's continued yearly retainer and future role as legal counsel without any interruption from Jimmy.

Defendants also interfered with HCI's business operations, trademark rights and leasehold rights through the eviction and trademark proceedings. Defendants

further interfered with Jimmy's long-time business relationship with Larry and with Hustler and with his anticipated future relationship/employment. Although Jimmy was deemed to be an at-will employee, the district court and this Court have previously acknowledged that Larry had made promises of Jimmy of continued compensation. Larry testified in July of 2012 that he had promised to "always" take care of Jimmy and that he had promised to pay him $250,000 to "stay away." (L. Flynt Dep., *Flynt I*, RE232-1, at 425, PID9865)  Larry told Jimmy that his financial well-being/retirement was secured through his trust. (*See id.* at 438, PID9874)  However, Jimmy was terminated and his pay was stopped without any severance or retirement. After working with/for Larry/Hustler for his entire adult life, Jimmy was put out on the street with no pay, no benefits, no retirement package, no severance, no health insurance, etc. Defendants were aware that Jimmy financially relied on his business relationship with his brother and the company and that he expected that relationship to continue for the remainder of his life. Reasonable minds could find that Defendants' interference with Jimmy/HCI's contractual and/or business relations was with malice, was based on Cambria's apparent dislike for Jimmy, was based on Defendants' financial self-interest to continue to receive the substantial yearly retainer fee and to put the Lipsitz Green firm in a position to ultimately control and run LFP/Hustler after Larry's retirement/death. Defendants planned and carried out a successful plan to inflict

economic pain and injury and to their former client in order to preserve and extend their relationship with another client (Larry/LFP). Defendants' interfering actions were proximal to Plaintiffs' contractual and/or business relations being adversely affected.

### D.    Reasonable Minds Could Conclude that Defendants Interfered with Jimmy's Expectancy/Retirement Interests

The Supreme Court of Ohio first recognized the tort of intentional interference with expectancy of inheritance in 1993 upon a certified question from this Court. *Firestone v. Galbreath*, 67 Ohio St.3d 87, 616 N.E.2d 202 (1993). The requisite elements for this claim are: (1) the existence of a plaintiff's expectancy of inheritance, (2) a defendant's intentional interference with that expectancy, (3) the defendant's tortious conduct involving the interference, such as fraud, duress, or undue influence, (4) a reasonable certainty that the expectancy of inheritance would have been realized, but for the defendant's interference, and (5) damage resulting from the interference. *Id*. at 88. The Ohio Supreme Court held that any person who can prove these elements can bring a claim. *Id*.

In deciding to recognize a claim for interference with expected inheritance, the Ohio Supreme Court found particularly instructive Restatement of the Law 2d, Torts (1979) 58, Section 774B, which provides:

Intentional Interference with Inheritance or Gift.

One who by fraud, duress or other tortious means intentionally

59

prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

Larry made repeated promises to Jimmy regarding Jimmy's continued compensation/retirement as secured by Larry Flynt Trust. (*See, e.g.*, L. Flynt Dep., RE79, at 89, PID2242) Mr. Cambria was aware of these promises and of Jimmy's expectancy interests based on Larry's promises (and previous assurances to Jimmy and Larry's parents). (Cambria Dep., RE76, at 221, PID1282) Jimmy's pay was stopped and he was removed from Larry's trust after he was fired by Larry. (L. Flynt Dep., RE79, at 89, PID2242) Cambria became a co-trustee of the trust at approximately the same time (2008-09) that Jimmy's share/interest was reduced, and then eliminated. (Cambria Dep., RE76, at 221, PID1282) A jury could conclude therefore that Cambria's interference with Jimmy's expectancy interest was motivated to exact revenge on Jimmy and/or to otherwise increase/improve Cambria's position, control, influence and/or financial interest in the trust/Hustler in the years to come.

## CONCLUSION

Plaintiffs-Appellants, Jimmy R. Flynt and Hustler Cincinnati, Inc., through counsel, hereby respectfully request that the district court's summary judgment decision (RE106) be reversed and that this matter be remanded for further proceedings.

s/ Robert W. Hojnoski
Robert W. Hojnoski (0070062)
Carrie M. Starts (0083922)
REMINGER CO., L.P.A.
525 Vine Street, Suite 1700
Cincinnati, Ohio 45202
Tel: 513/721-1311; Fax: 513-721-2553
E-mail: rhojnoski@reminger.com;
cstarts@reminger.com
*Attorneys for Plaintiffs/Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this brief used Times New Roman at 14 point, and contains 13,829 words.

s/ Robert W. Hojnoski
Robert W. Hojnoski

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Principal Merit Brief of Appellants was served on all parties or counsel of record this 27th day of March, 2015 via the use of this Court's CM/ECF filing system.

s/ Robert W. Hojnoski
Robert W. Hojnoski

# DESIGNATION OF RELEVANT
# LOWER COURT DOCUMENTS

** As referred to in this designation of relevant lower court documents, "Plaintiffs" shall refer to Hustler Cincinnati, Inc. and Jimmy Flynt; "Defendants" shall refer to all named Defendants in this action.

| RE | Description | Page ID Range |
|----|-------------|---------------|
| 1 | COMPLAINT filed by Plaintiffs against Defendants | 1-17 |
| 15 | MOTION TO DISMISS complaint by Defendants | 42-99 |
| 16 | AMENDED MOTION TO DISMISS for failure to state a claim by Defendants | 100-158 |
| 17 | AMENDED COMPLAINT filed by Plaintiffs against Defendants | 159-282 |
| 18 | Plaintiffs' RESPONSE to Defendants' amended motion to dismiss | 283-284 |
| 19 | Defendants' MOTION TO DISMISS FIRST AMENDED COMPLAINT | 285-362 |
| 20 | Plaintiffs' BRIEF IN OPPOSITION to Defendants' motion to dismiss first amended complaint | 363-510 |
| 22 | Defendants' REPLY IN SUPPORT of motion to dismiss first amended complaint | 513-529 |
| 23 | Defendants' MOTION FOR SANCTIONS | 530-566 |
| 25 | Plaintiffs' BRIEF IN OPPOSITION to Defendants' motion for sanctions | 568-577 |
| 26 | ORDER denying Defendants' motion to dismiss and motion for sanctions | 578-580 |
| 27 | MOTION HEARING held | 581-630 |
| 28 | ANSWER to amended complaint filed by Defendants | 631-721 |
| 40 | ORDER following informal discovery conference held on 8/22/2013 | 768-770 |
| 41 | Defendants' BRIEF REGARDING THE ATTORNEY-CLIENT PRIVILEGE | 771-784 |
| 42 | ORDER re previous order [40] | 785-786 |
| 43 | Defendants' BRIEF re previous order [40] | 787-841 |
| 44 | Plaintiffs' BRIEF re previous order [40] | 842-858 |
| 45 | Defendants' REPLY BRIEF re the deposition of H. Louis Sirkin | 859-896 |

| 46 | Plaintiffs' BRIEF re attorney-client privilege issues and potential deposition of H. Louis Sirkin | 897-1006 |
|---|---|---|
| 50 | ORDER following informal discovery conference held on 9/27/2013 | 1010-1011 |
| 54 | ORDER following informal discovery conference held on 10/18/2013 | 1015 |
| 63 | Defendants' BRIEF re production of privileged and confidential materials | 1026-1035 |
| 65 | Plaintiffs' BRIEF IN OPPOSITION to Defendants' brief re production of allegedly privileged and confidential materials | 1040-1041 |
| 68 | Defendants' REPLY re production of privileged and confidential materials | 1056-1066 |
| 71 | ORDER re outstanding discovery dispute | 1069-1084 |
| 74 | NOTICE OF FILING DEPOSITITON | 1088-1089 |
| 75 | DEPOSITION of Jonathon W. Brown taken on 9/4/2013 by Defendants | 1090-1226 |
| 76 | DEPOSITION of Paul Cambria taken on 9/5/2013 by Defendants | 1227-1337 |
| 77 | DEPOSITION of Michael S. Deal taken on 9/4/2013 by Defendants | 1431-1501 |
| 78 | DEPOSITION of Jimmy Flynt taken on 5/21/2013 by Defendants | 1502-2221 |
| 80 | DEPOSITION of  Donald C. Fritz taken on 12/17/2013 by Defendants | 2261-3088 |
| 81 | DEPOSITION of Joseph Gumkowski taken on 9/6/2013 by Defendants | 3089-3300 |
| 82 | DEPOSITION of Allie L. Jackson III taken on 6/27/2013 by Defendants | 3301-3442 |
| 83 | DEPOSITION of Jeffrey Reina Vol. 1 taken on 9/5/2013 by Defendants | 3443-3500 |
| 84 | DEPOSITION of Jeffrey Reina Vol. 2 taken on 9/6/2013 by Defendants | 3501-3693 |
| 85 | Defendants' MOTION FOR SUMMARY JUDG MENT | 3694-3747 |
| 86 | Defendants' AFFIDAVIT of Beth A. Bryan re motion for summary judgment [85] | 3748-3750 |
| 87 | Defendants' AFFIDAVIT of Paul Cambria re motion for summary judgment [85] | 3868-3870 |

| 89 | DEPOSITION of Allie L. Jackson III taken on 12/18/2013 by Plaintiffs | 4061-4103 |
|---|---|---|
| 90 | DEPOSITION of John Scott, Esq., taken on 2/10/2014 by Plaintiffs | 4104-4420 |
| 91 | DEPOSITION of Geoffrey Stern Esq., Vol. 1, taken on 1/13/2014 by Plaintiffs | 4421-4841 |
| 92 | DEPOSITION of Geoffrey Stern Esq., Vol. 2, taken on 1/30/2014 by Plaintiffs | 4842-4927 |
| 93 | DEPOSITION of Paul Cambria, Esq., taken on 3/12/2010 by Plaintiffs | 4928-5067 |
| 94 | DEPOSITION of Joseph Gumkowski taken on 3/12/2010 by Plaintiffs | 5068-5141 |
| 95 | DEPOSITION of Jonathon Brown, Esq., taken on 3/31/2010 by Plaintiffs | 5142-5247 |
| 97 | DEPOSITION of Larry Flynt taken on 4/16/2010 by Plaintiffs | 5250-5288 |
| 98 | DEPOSITION of Larry Flynt taken on 7/3/2012 by Plaintiffs | 5289-5349 |
| 99 | Plaintiffs' BRIEF IN OPPOSITION to Defendants' motion for summary judgment | 5350-5462 |
| 101 | Defendants' REPLY IN SUPPORT of motion for summary judgment | 5470-5505 |
| 106 | MEMORANDUM OPINION AND ORDER granting Defendants' motion for summary judgment | 5510-5534 |
| 107 | JUDGMENT entered in favor of Defendants | 5535 |
| 109 | NOTICE OF APPEAL as to final judgment | 5549-5550 |

**In addition to the above listed lower court documents, Plaintiffs also rely on the below documents from the prior related action of *L.F.P.IP, LLC v. Hustler Cincinnati*, Southern District of Ohio No. 1:09-cv-00913. The district court incorporated by reference the lower court record from that case and permitted the parties to rely on any evidence submitted in the prior related case in the instant matter. (*See* Order on Motion to Dismiss, RE26, at 2, PID579)

As referred to in this portion of the designation of relevant lower court documents, "Plaintiffs" shall refer to L.F.P. IP, LLC, LFP, Inc. and Larry C. Flynt; "Defendants" shall refer to Hustler Cincinnati, Inc. and Jimmy R. Flynt.

| 165 | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION | 8239-8255 |
|---|---|---|
| 179 | DECLARATION of Jimmy Flynt | 8616-8624 |
| 187 | OPINION AND ORDER granting Plaintiffs' motion for summary judgment and denying Defendants' motion for summary judgment | 8767-8788 |
| 235 | OPINION AND ORDER granting Plaintiffs' motion for summary judgment | 9911-9925 |