**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0578n.06

Case No. 14-4130

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| HUSTLER CINCINNATI, INC., et al., | ) | FILED |
|  | ) | Aug 14, 2015 |
| Plaintiffs-Appellants, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE SOUTHERN DISTRICT OF |
| PAUL CAMBRIA, JR., et al., | ) | OHIO |
|  | ) |  |
| Defendants-Appellees. | ) |  |
|  | ) |  |
|  | ) |  |

BEFORE: SUTTON and DONALD, Circuit Judges; ZOUHARY, District Judge.[*]

SUTTON, Circuit Judge.  The Hustler enterprise is a media conglomerate that publishes sexually explicit magazines, operates retail stores, and manages a clothing line, among many other ventures.  It also started as a family business. Brothers Jimmy and Larry Flynt opened the first Hustler nightclub together in 1969, and many members of the Flynt clan have worked in the Hustler enterprise over the years.  But family strife led to business discord (and business problems to family problems) in the late 2000s, when Jimmy and Larry had a falling out.  The result has been an endless stream of litigation.  At issue in today's installment of this saga is whether five attorneys who were associated with the Hustler enterprise committed legal malpractice and tortiously interfered with contractual relations, business relations, and

---

[*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

expectancy interests. The district court granted the attorneys' motion for summary judgment on all claims. We affirm.

I.

The Hustler enterprise first published its flagship magazine in 1974, and litigation followed soon after. The initial wave of litigation involved criminal prosecutions. In 1976, the State of Ohio indicted Jimmy and Larry for pandering obscenity. The brothers retained two attorneys from a Buffalo law firm known (at the time) as Lipsitz, Green, Fahringer, Roll, Schueler & James. A young associate named Paul Cambria defended Jimmy, who was acquitted, while named partner Harold Fahringer represented Larry, who was convicted. The conviction was overturned on appeal.

Over two decades passed before Cambria and Jimmy crossed paths again. In 1997, Jimmy formed Hustler News & Gifts, Inc., an Ohio corporation that operated a Hustler bookstore in Cincinnati. The next year, Jimmy and Larry faced another prosecution, this one related to the sale of obscene materials at the bookstore. They retained three lawyers: Cambria, Lou Sirkin (a Cincinnati attorney), and Alan Isaacman (Hustler's longtime corporate counsel). In 1999, the Flynt brothers accepted a plea bargain that substituted Hustler News & Gifts as the sole defendant, that conceded guilt by the corporation, and that required the corporation to pay a fine.

After this conviction, Jimmy incorporated a new entity named Hustler Cincinnati, Inc., of which he became the sole owner. He leased property at 411 Elm Street in Cincinnati and opened a new store there. Soon after, Jimmy exercised an option to purchase the property, relying (in part) on funds provided by the Hustler parent corporation.

In December 2000, Jimmy opened another Hustler store, this one located in Monroe, Ohio, and operated by an entity named Hustler Hollywood-Ohio, Inc. Jimmy held all of the

shares of Hustler Hollywood-Ohio, though the parties dispute whether he was the true owner or a straw man designed to shield Larry from prosecution. One of Larry's companies owned the real estate on which the Monroe store sat and leased it to Hustler Hollywood-Ohio.

In 2001, Larry fired his corporate attorney, Alan Isaacman, and negotiated an oral retainer agreement with Cambria's law firm, by then named Lipsitz Green Scime Cambria. To recap: At the time of this agreement, Jimmy owned two entities (Hustler Cincinnati and Hustler Hollywood-Ohio) and the real estate on which the Cincinnati store sat; Larry's corporation owned the Monroe real estate. Over the next four years, the business relationship between Jimmy and Larry changed significantly. Hustler Hollywood-Ohio entered into a new lease with Larry's corporation and began paying higher rent for the Monroe property. Within a few years, Jimmy sold all of his stock in Hustler Hollywood-Ohio to one of Larry's companies. Jimmy received $150,000 for the stock but paid it all back to Larry as licensing fees for prior use of the Hustler trademark. Then Jimmy sold the Cincinnati property to another Larry-owned entity and leased it back. And in late 2004, Hustler Cincinnati began paying licensing fees to the Hustler parent company for use of its trademarks. By the end of this chain of transactions, Jimmy owned just one piece of Hustler-related property: Hustler Cincinnati.

In 2009, following a dispute between Larry and Jimmy's sons, Larry fired Jimmy from the Hustler enterprise. One of Larry's companies attempted (unsuccessfully) to evict Hustler Cincinnati from the property at 411 Elm Street, *Hustler Cincinnati, Inc. v. Elm 411, L.L.C.*, No. C-130754, 2014 WL 7339031, at *2, 8 (Ohio Ct. App. Dec. 24, 2014), while another filed a (successful) trademark infringement action against the Cincinnati store, *L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 618–22 (6th Cir. 2013). Larry also allegedly removed Jimmy from the Larry Flynt Revocable Trust, which holds many of Hustler's assets.

Case No. 14-4130
*Hustler Cincinnati, Inc. v. Cambria*

In 2009, Jimmy and Hustler Cincinnati filed a legal-malpractice action in state court against Cambria, four other lawyers at Lipsitz Green, and the firm itself. The trial court dismissed their claims without prejudice.

So ends the prelude to this lawsuit. In 2010, after the state court dismissed the action, Jimmy and Hustler Cincinnati filed *this* lawsuit in federal court. They claimed that the five attorneys sued in the state court action had committed legal malpractice by representing both Jimmy and Larry in several transactions where the brothers had adverse interests, including the lease and licensing agreements that transferred Jimmy's interests in the Ohio stores to Larry. Jimmy and Hustler Cincinnati also filed claims of tortious interference with contractual rights, business relations, and expectancy interests. The district court granted summary judgment to the attorneys on all claims, holding that there was no attorney-client relationship between Jimmy or Hustler Cincinnati and Lipsitz Green.

II.

To prove legal malpractice under Ohio law, a plaintiff must establish (1) an attorney-client relationship, (2) a professional duty arising from the relationship, (3) breach of the duty, (4) proximate cause, and (5) damages. *Shoemaker v. Gindlesberger*, 887 N.E.2d 1167, 1169–70 (Ohio 2008). There are two ways to form an attorney-client relationship under Ohio law: by express contract or by implication. *Cuyahoga Cnty. Bar Ass'n v. Hardiman*, 798 N.E.2d 369, 373 (Ohio 2003). Jimmy and Hustler Cincinnati have not presented evidence that they formed an attorney-client relationship with Lipsitz Green in either way.

First, there is no evidence of an express contract. It is true that Cambria represented Jimmy in the 1976 and 1998 criminal prosecutions. Yet under Ohio law, as under the law of most States, the attorney-client relationship ends when the lawyer completes the task for which

Case No. 14-4130
*Hustler Cincinnati, Inc. v. Cambria*

he was hired—each criminal case in this instance. *See Kouba v. Climaco*, No. 38585, 1979 WL 210054, at *2 (Ohio Ct. App. Mar. 15, 1979); *see also* Ohio R. Prof'l Conduct 1.16 cmt. 1. Nor is there evidence that Larry's 2001 retainer with Lipsitz Green encompassed representation of Jimmy or Hustler Cincinnati. Larry and Cambria both testified that the agreement did *not* cover Jimmy (and that Jimmy was not at the meeting where the final agreement was struck). Jimmy himself stated that he could not recall whether he had attended the meeting. Nonetheless, pointing to his own deposition testimony and that of his accountant, Jimmy claims that Larry assured him the agreement would cover Hustler Cincinnati. But according to Jimmy's deposition, Larry simply told him that Cambria was hired as "[c]orporate counsel." R. 78 at 37. This may suggest that Lipsitz Green was outside counsel for the Hustler enterprise, but it does not indicate that the firm represented Hustler Cincinnati or, further afield, Jimmy. Jimmy's accountant testified about his interactions with Lipsitz Green but expressed no opinion about whether the retainer agreement, to which he was not a party, covered Jimmy. All in all, there is no evidence of an express attorney-client relationship between Jimmy or Hustler Cincinnati and the Lipsitz Green attorneys.

The claimants fare no better in their attempts to conjure an implied relationship. Under Ohio law, "[t]he determination of whether an attorney-client relationship was created turns largely on the reasonable belief of the prospective client." *Hardiman*, 798 N.E.2d at 373. In assessing the reasonableness of a client's belief, Ohio courts consider several factors, including whether (1) the client shared confidential information with the attorney, (2) the attorney offered legal advice or services, (3) the client relied on the advice, (4) the client sought to form an attorney-client relationship, (5) the attorney appeared on behalf of the client in judicial or administrative proceedings, and (6) the attorney prepared legal instruments. *See Sayyah v.*

*Cuttrell*, 757 N.E.2d 779, 786 (Ohio Ct. App. 2001); *Landis v. Hunt*, 610 N.E.2d 554, 558 (Ohio Ct. App. 1992); *David v. Schwarzwald, Robiner, Wolf & Rock Co.*, 607 N.E.2d 1173, 1180 (Ohio Ct. App. 1992). Courts place particular weight on whether the client shared confidential information with the attorney. *Landis*, 610 N.E.2d at 558. The bar for proving an implied attorney-client relationship is high. Innuendos and insinuations do not suffice to form such a bond; the parties must point to "the *manifest intentions* of the attorney and the prospective client." *New Destiny Treatment Ctr., Inc. v. Wheeler*, 950 N.E.2d 157, 162 (Ohio 2011) (emphasis added). In this sense, the term "implied attorney-client relationship" is a misnomer. The relationship is implied only in the sense that it does not emerge from a formal contract; it comes from the parties' less formal—yet still manifest—expectations.

The evidence shows that Jimmy and Hustler Cincinnati never formed an implied attorney-client relationship with the Lipsitz Green lawyers. Jimmy never shared any confidential information with four of these attorneys: Jonathan Brown, Michael Deal, Joseph Gumkowski, and Jeffrey Reina. Nor could Jimmy identify any legal advice about Hustler Cincinnati that he received from them, even when asked during his deposition. Cambria, on the other hand, admits that Jimmy shared confidential information with him. But all of this information related to Jimmy's work as an *employee* of the Hustler enterprise, not to Jimmy personally or to his role as Hustler Cincinnati's owner. *See Nilavar v. Mercy Health Sys.-W. Ohio*, 143 F. Supp. 2d 909, 913 (S.D. Ohio 2001); *see also* Ohio R. Prof'l Conduct 1.13(a). Jimmy, for example, exchanged numerous emails with Cambria about zoning, marketing, and employment issues related to Hustler retail stores, consistent with Jimmy's role as a Hustler employee in handling merchandising and zoning for Hustler's retail arm.

Jimmy and Hustler Cincinnati also have not pointed to any evidence that they paid Lipsitz Green for legal services. The absence of bills is all the more striking because Jimmy made numerous payments to Lou Sirkin, who represented Hustler Cincinnati throughout the relevant period—from 2000 to 2009. Indeed, some of Sirkin's bills include charges related to the transfer of the Cincinnati real estate, while others list charges for "[m]iscellaneous matters" at Hustler Cincinnati, R. 82-29 at 1. And while Jimmy's accountant testified that Hustler Cincinnati's legal fees were funneled through the Hustler parent corporation, the record does not reveal whether these fees made their way to Lipsitz Green or to a different set of lawyers. If we follow the money, it leads to Sirkin, not Lipsitz Green, as the attorney for Jimmy and Hustler Cincinnati.

Jimmy offers a 2001 letter and a 2004 email in which Lipsitz Green attorneys communicated with him about the transfer of the Cincinnati real estate and the lease/licensing agreement for the Monroe store. But these documents do not furnish legal advice to Jimmy or explain how the deals will affect Jimmy in his personal capacity, as opposed to employment capacity.

Jimmy next points to the testimony of three witnesses: his accountant, Allie Lee Jackson, III; and two expert witnesses who opined that Lipsitz Green had formed an attorney-client relationship with Jimmy and Hustler Cincinnati. These witnesses, however, have no special insight into the legal question that drives our inquiry: Did Jimmy reasonably view the Lipsitz Green lawyers as his personal attorneys (or as corporate counsel for Hustler Cincinnati)? Jimmy's accountant may have subjectively believed that Lipsitz Green represented Hustler Cincinnati, but Jimmy's accountant also did not see the record we have before us, a record that reveals no evidence of services rendered, fees paid, or confidences exchanged. And while Ohio

courts have held that expert testimony is typically required to establish an attorney's *breach of duty*, *Yates v. Brown*, 925 N.E.2d 669, 674 (Ohio Ct. App. 2010), we need not rely on experts to determine whether an attorney-client relationship exists, much less whether an implied relationship exists. *See* Fed. R. Evid. 702. That is especially true here, because the district court found that some of the statements on which the experts relied were not supported by the record.

Even if no express or implied attorney-client relationship existed, Jimmy and Hustler Cincinnati claim that two Ohio law exceptions to the traditional requirements for proving legal malpractice apply. The first arises when the party shows that he "is in privity with the client for whom the legal services were performed." *LeRoy v. Allen, Yurasek & Merklin*, 872 N.E.2d 254, 256 (Ohio 2007) (quoting *Simon v. Zipperstein*, 512 N.E.2d 636, 638 (Ohio 1987)). Relying on *Black's Law Dictionary*, Ohio courts have defined "privity" as "[t]he connection or relation between two parties, each having a legally recognized interest in the same subject matter . . . ; mutuality of interest." *Sayyah*, 757 N.E.2d at 787; *see also Shoemaker*, 887 N.E.2d at 1170. Here, Jimmy and Hustler Cincinnati's theory of the case forecloses a finding of "mutuality of interest." They claim that Hustler Cincinnati's interests *diverged* from those of the parent corporation and that the Lipsitz Green attorneys committed malpractice by representing both sides in transactions between these two entities. Embedded in this argument is the reality that the Flynt brothers do not have the same "legally recognized interest" in the subject matter of this case.

Ohio courts also have declined to recognize privity in cases where the two parties' interests were much more closely aligned than the interests at issue here. *Scholler v. Scholler*, 462 N.E.2d 158, 163–64 (Ohio 1984), held that a mother was not in privity with her son for purposes of seeking child-support payments from the child's father. And *Simon v. Zipperstein*,

512 N.E.2d 636, 638 (Ohio 1987) (per curiam), held that the potential beneficiary of a will (who had no vested interest in the estate) was not in privity with the testator. Jimmy counters by citing several (nonbinding) cases in which a nominee or agent was held to be in privity with the principal. *See Breinholt v. Aegis Wholesale Corp.*, No. 10-cv-00466-EJL, 2012 WL 2865969, at *3 (D. Idaho July 11, 2012); *Dimov v. EMC Mortg. Corp.*, No. 1:11-CV-160, 2012 WL 1071186, at *3 (E.D. Tenn. Mar. 29, 2012); *see also ABS Indus. Inc. ex rel. ABS Litig. Tr. v. Fifth Third Bank*, 333 F. App'x 994, 998–1002 (6th Cir. 2009). But these cases all address whether two parties are in privity such that the entry of judgment against one of them precludes relitigating the same claims against the other. *See ABS Indus.*, 333 F. App'x at 998; *Breinholt*, 2012 WL 2865969, at *3; *Dimov*, 2012 WL 1071186, at *3. None of these cases arose in the legal-malpractice context, and only one (*ABS Industries*) applies Ohio law, *see* 333 F. App'x at 1002. No less importantly, Jimmy testified that he was *not* Larry's agent or straw man, and a fundamental tenet of his argument is that Lipsitz Green failed to protect his interests as the true owner of the Monroe store. Jimmy and Hustler Cincinnati have failed to show that they were in privity with Larry or the Hustler parent company.

Under the second exception, a party may prove legal malpractice by showing that "the attorney act[ed] with malice." *LeRoy*, 872 N.E.2d at 256. To make this showing, Jimmy and Hustler Cincinnati must establish that the Lipsitz Green lawyers acted with "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *McGuire v. Draper, Hollenbaugh & Briscoe Co.*, No. 01CA21, 2002 WL 31521750, at *11 (Ohio Ct. App. Nov. 4. 2002). Jimmy and Hustler Cincinnati, however, have not shown any "special circumstances such as fraud, bad faith, collusion or other malicious

conduct which would justify departure from the general rule" precluding attorneys' liability to third parties. *Simon*, 512 N.E.2d at 638. Nor does *Wilkey v. Hull*, 598 F. Supp. 2d 823 (S.D. Ohio 2009), help their cause. That case found that the plaintiff's "accusation that [the defendant attorney] acted maliciously [was] not supported by anything other than his own *ipse dixit*." *Id.* at 834. So too here. The only evidence that the Lipsitz Green attorneys acted maliciously comes from Jimmy's speculations about their motives. Unsupported speculation does not suffice to survive summary judgment. *See Rodriguez v. Stryker Corp.*, 680 F.3d 568, 573 (6th Cir. 2012).

Finally, Jimmy cannot allege legal malpractice against Lipsitz Green itself. Under Ohio law, a firm can be held vicariously liable for the legal malpractice of its attorneys but cannot commit legal malpractice itself. *Nat'l Union Fire Ins. Co. v. Wuerth*, 913 N.E.2d 939, 943–45 (Ohio 2009). Because Jimmy cannot prove legal malpractice against any of Lipsitz Green's attorneys, he also fails to allege malpractice against the firm.

None of this is to say that Cambria and Lipsitz Green acted wisely in their dealings with Hustler Cincinnati. The lawyer and firm should have explicitly defined the scope of their representation of Larry and his companies. *See Hardiman*, 798 N.E.2d at 373; Ohio R. Prof'l Conduct 1.5(b). That is particularly true in the context of a complex, privately held corporation where the risk that business and personal relationships will blur increases. *Cf. Stuffleben v. Cowden*, No. 82537, 2003 WL 22805065, at *6 (Ohio Ct. App. Nov. 26, 2003). Although no reasonable jury could find that an attorney-client relationship existed here, the case is closer than it should have been.

Case No. 14-4130
*Hustler Cincinnati, Inc. v. Cambria*

III.

Even if Jimmy or Hustler Cincinnati had created a material issue of fact over whether they formed an attorney-client relationship with Lipsitz Green, their claims still would fail.

*First*, Jimmy and Hustler Cincinnati cannot show that any damages from these claims were proximately caused by the alleged legal malpractice. They point to three sources of damages: (1) Jimmy's firing; (2) Hustler Cincinnati's "excessive rent and license fees" as well as "loss of revenue" resulting from Larry's actions; and (3) Jimmy's sale of Hustler Hollywood-Ohio. R. 80-1 at 8. But Jimmy and Hustler Cincinnati have failed to provide concrete evidence about the causal connection between the alleged malpractice and the damages sought. *See Gijbertus D.M. van Sommeren v. Gibson*, 991 N.E.2d 1199, 1206 (Ohio Ct. App. 2013). Jimmy argues that he could have retained his employment if the Lipsitz Green attorneys had advised him that he was an at-will worker. But Jimmy does not allege that the Lipsitz Green lawyers were his *employment* attorneys, so it is unclear how their advice (or lack thereof) could have affected his employment status. At any rate, the undisputed testimony shows that Larry fired Jimmy because of a family conflict involving Jimmy's sons, something the lawyers had no power to control. Jimmy adds that the Lipsitz Green attorneys advised him to sell the Monroe store and pay rent/licensing fees from Hustler Cincinnati. But Jimmy could not point to any specific advice that he received from the attorneys about these issues, nor could he explain how he would have reached a different decision absent the lawyers' involvement. A 2004 email from Cambria does not do the trick, as it merely explains the structure of the Cincinnati real estate transaction without advising Jimmy to enter into the deal. Jimmy's generalized allegations do not show that the attorneys' actions caused his damages.

*Second*, virtually all of the alleged acts of malpractice occurred outside the one-year statute of limitations, O.R.C. Ann. § 2305.11(A)—and the few remaining acts relate to Jimmy's *employment* claims, which cannot survive since the Lipsitz Green lawyers were not his employment attorneys. The limitations clock starts (1) when the client "discovers or should have discovered that his injury was related to" the attorney's malpractice (the "discovery rule") *or* (2) "when the attorney-client relationship for that particular transaction or undertaking terminates" (the "termination rule"), whichever occurs later. *Smith v. Conley*, 846 N.E.2d 509, 511–12 (Ohio 2006). In this case, the primary alleged acts of malpractice occurred in 2004 (when Jimmy sold the Monroe store and Hustler Cincinnati started paying licensing fees) and 2006 (when Jimmy sold the Cincinnati real estate and started paying rent). Jimmy claims that, in the course of these transactions, he received bad advice from his lawyers and made bad deals as a result. But to the extent he suffered injury, he discovered it—or should have discovered it—as soon as he closed the deals. And if we take his allegations at face value, he knew from the get-go that his lawyers had contributed to his injuries: They had advised him to enter into the flawed transactions. To the extent there was an attorney-client relationship for the "particular transaction[s] or undertaking[s]" at issue, moreover, it ended well before Jimmy filed this lawsuit. *See Omni-Food & Fashion, Inc. v. Smith*, 528 N.E.2d 941, 944 (Ohio 1988). When Jimmy sold the Monroe store in 2004, the attorney-client relationship with respect to that store necessarily concluded; when he began paying licensing fees in 2004, any representation he received with respect to the fee contract necessarily ended; when he sold the Cincinnati property and started paying rent in 2006, any attorney-client relationship with respect to the real estate deal necessarily was complete. Whether we measure the statute of limitations from the date of

discovery or the close of the attorney-client relationship, the statute had run for many of Jimmy's claims by 2007—nearly two years before he filed suit.

IV.

Jimmy and Hustler Cincinnati bring three other claims against the Lipsitz Green attorneys and the firm itself: tortious interference with contractual rights, business relations, and expectancy interests. None of these claims has merit either.

Jimmy and Hustler Cincinnati characterize their first claim as tortious interference with "contractual relations," alleging that Larry wrongfully fired Jimmy from the Hustler enterprise. *See* Appellants' Br. 52, 57. But "tortious interference with contract is not a viable cause of action" for at-will employees. *Mitchell v. Mid-Ohio Emergency Servs., L.L.C.*, No. 03AP-981, 2004 WL 2803419, at *9 (Ohio Ct. App. Sept. 30, 2004); *see also Hoyt, Inc. v. Gordon & Assoc.*, 662 N.E.2d 1088, 1095 (Ohio Ct. App. 1995). And we have previously held that Jimmy was an at-will employee of the Hustler enterprise. *L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 622–23 (6th Cir. 2013).

Even if we re-characterize Jimmy's claim as tortious interference with employment relations—recognized as a distinct tort under Ohio law, *Mitchell*, 2004 WL 2803419, at *9—Jimmy fares no better. To prove this claim, Jimmy must show (1) the existence of an employment relationship, (2) the defendant's awareness of this relationship, (3) intentional interference with the relationship, and (4) injury proximately caused by the defendant. *McNett v. Worthington*, No. 15-11-05, 2011 WL 4790759, at *3 (Ohio Ct. App. Oct. 11, 2011). Jimmy fails to point to any record evidence indicating that the Lipsitz Green attorneys influenced Larry's decision to fire his brother. Jimmy's unsupported speculations during his deposition do

not create a genuine dispute of material fact, especially when Larry repeatedly asserted that it was his, and only his, decision to fire his brother.

Jimmy's remaining claims fail for the same reason. To prove tortious interference with business relations, Jimmy must establish (1) a business relationship, (2) the defendant's knowledge of the relationship, (3) intentional interference resulting in "a breach or termination of the relationship," and (4) damages. *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 2015). Once again, Jimmy cites no evidence other than his own conjectures, that Lipsitz Green influenced Larry's decisions to fire Jimmy, raise the rent on Hustler Cincinnati or require it to pay licensing fees, evict the Cincinnati store, or purchase Hustler Hollywood-Ohio. Larry explained that these decisions were his alone.

Finally, to prove tortious interference with expectancy of inheritance, Jimmy must establish: (1) an expectancy of inheritance; (2) the defendant's intentional interference with that expectancy; (3) tortious conduct on the part of the defendant; (4) "a reasonable certainty that the expectancy of inheritance would have been realized, but for the interference by the defendant"; and (5) damages. *Firestone v. Galbreath*, 616 N.E.2d 202, 203 (Ohio 1993). But Jimmy has not pointed to any evidence that Lipsitz Green interfered (let alone *tortiously* interfered) with Larry's estate planning or his decision to fire Jimmy. Although Larry admitted that he had amended his trust after discharging Jimmy, he testified that he had not consulted Lipsitz Green before making the changes. In fact, a different lawyer, Rick Corletta, represented Larry on estate-planning matters. As a result, there is no genuine dispute of material fact with respect to any of Jimmy's tortious interference claims against Lipsitz Green and its attorneys.

For these reasons, we affirm.